*892
 
 LEVIN H. CAMPBELL, Chief Judge.
 

 This is an appeal by petitioner Sheehan, Phinney, Bass & Green, P.A. (Sheehan), from an order by the United States District Court for the District of Massachusetts awarding petitioner approximately one-third of the amount it requested as compensation for legal services rendered on behalf of the Boston and Maine Corporation (B & M) in connection with an eminent domain proceeding before the New Hampshire Eminent Domain Commission. Because we find the fees requested were reasonable, we remand the case to the district court with instructions to award the petitioner the full amount of its requested fees.
 

 I.
 

 In 1970 B & M began bankruptcy reorganization proceedings under § 77 of the Bankruptcy Act of 1898, 11 U.S.C. § 205 (1976 ed.). On October 29, 1975, the Public Utilities Commission of the State of New Hampshire (the Commission) exercised the state’s power of eminent domain over two railroad lines owned by B & M. As required by 498-A:ll N.H.R.S. (Supp.1979), the Commission deposited $1 million with the Merrimack County Superior Court, representing its initial estimate of the amount of just compensation owed to B & M. In January 1978 Sheehan was retained by the trustees of B & M to litigate the amount of damages arising from the taking.
 

 According to Sheehan’s undisputed testimony before the district court, the customary fee among New Hampshire attorneys for representation of compensation disputes in eminent domain cases is 50% of the amount recovered in excess of the commission’s tender deposit. Because it thought this arrangement would result in a disproportionately large fee, however, Sheehan proposed to be billed on a time and efforts basis, plus expenses, with the addition of a contingent fee of 15% of the excess of the award over the tender deposit. B & M’s trustee accepted this proposal and engaged the services of Sheehan under a blanket authorization from the prior district judge overseeing the proceedings to the trustees of B
 
 &
 
 M to hire counsel.
 
 See
 
 Order No. 105,
 
 In re Boston & Maine Corp.,
 
 No. 70-250-F (D.Mass. March 27, 1972),
 
 reprinted in In re Certain Special Counsel to Boston & Maine Corp.,
 
 737 F.2d 115, 127-28 (1st Cir.1984).
 

 The representation of B & M before the commission was conducted chiefly by William S. Green, a name partner of Sheehan with extensive experience in trying eminent domain cases, and by Warren Rudman, formerly the Attorney General of New Hampshire. Sheehan faced at least two significant obstacles in representing B & M. First, title to 10 to 20% of B & M’s lines was subject to the claims of persons purporting to hold residual interests or competing claims. It was important, however, to have the land treated as if it were owned in its entirety in fee simple, since the expert evidence presented by B & M tended to show that the value of the entire rights-of-way was greater than the sum of the values of each separate parcel. Sheehan successfully persuaded the Commission to treat the two railroad lines as owned in fee simple in their entirety, reserving a fund of $100,000 from the final award to satisfy any possible claim by one particular claimant, Loch Haven Corporation.
 

 Second, during an earlier proceeding before the district court in which it sought to abandon the lines because they were unprofitable, B & M presented testimony by its employees that the net value of the land, track, and bridges on the line as of January 1973 was $979,377, or $20,623 less than the Commission’s tender deposit, and that the appropriate method of valuing the lines was their net salvage value. This testimony directly contradicted testimony before the Commission that the net salvage value of the line in 1975 was $2 million, and that the appropriate method of determining the lines’ fair market value was to use the value of the lines as corridors for sewer lines, utility lines, etc.
 

 Despite these difficulties, on July 24, 1980, Sheehan succeeded in obtaining for B & M an award of $2,328 million plus whatever funds remained from the reserved
 
 *893
 
 $100,000 after satisfying the claims of Loch Haven Corporation, plus the sum of $331,058.56, representing interest accrued on the $1 million tender deposit since 1975. This amount exceeded by at least $1,328 million the Commission’s tender offer, and by $703,000 the State’s final pre-trial offer of $1,625,000.
 

 On September 25, 1980 Sheehan filed a petition with the district court for payment for legal services rendered through November 30, 1979. As provided under the terms agreed to by B & M’s trustees, Sheehan requested $226,975.76 in compensation. This amount consisted of $25,517 for the time spent by its attorneys in preparing B & M’s case, billed at their respective customary hourly rates; $683 for secretarial services; $1,575.76 for expenses; and $199,200 representing 15% of the difference between the $2,328 million minimum final award and the $1 million tender offer. Sheehan subsequently amended its petition to add another $7,593 for attorney’s fees, $189 for secretarial services, and $209.12 for other expenses incurred between December 1, 1979 and November 30, 1980. Acting under the former 11 U.S.C. § 205(c)(2), the Interstate Commerce Commission (ICC) approved in September 1981 the total requested fees and expenses— $234,966.88 — as the maximum allowable amount. The ICC found at that time that the “normal” fee in New Hampshire for representation in eminent domain cases is 50% of the difference between the tender deposit and the final award, and that the award was both reasonable and not unduly burdensome to B & M’s estate.
 

 On November 17, 1981, the district judge overseeing the B & M reorganization held a hearing on Sheehan’s petition. In January 1982, the judge revoked Order 105 and other orders, issued by a previous judge, under authority of which Sheehan and other counsel had been retained, since he believed that they did not comply with required procedures. The trustees applied to the court to have the appointments of counsel approved retroactively. After some delay, the reorganization judge circulated a draft memorandum of an order denying fees for all services rendered pursuant to the revoked orders except as fees might be allowed under equitable principles. Shee-han, along with other counsel retained by B & M’s trustees to perform various legal services, then brought a petition for writ of mandamus before this court to compel the district court to grant their fee petitions. We denied the writ, but instructed the district court that counsel’s appointments “should be confirmed, to be effective as of the date work was assigned to them,” thereby placing counsel “in the status they would have occupied had prior court orders been entered which complied strictly with the rule.”
 
 In re Certain Special Counsel,
 
 737 F.2d at 119.
 

 Pursuant to this direction, the district court held another hearing on Sheehan’s fee petition on August 29, 1984. Robert Meserve, a trustee for B & M, testified that the result obtained was “very satisfactory,” and that the 15% difference charged in addition to Sheehan’s hourly billings was “completely warranted by New Hampshire practice and by the results obtained.” No objections or other opposition to the requested fees was filed at the time. Nonetheless, in an October 14, 1984 memorandum and order, the district court awarded Sheehan only $80,000 in fees plus $1,889.88 for expenses.
 
 See In re Boston & Maine Corp.,
 
 46 B.R. 983 (D.Mass.1984).
 

 The court began its reasoning by granting
 
 in toto
 
 Sheehan’s requested hourly fees of $33,110, plus its requested expenses of $2,656.88 less $767 for secretarial services, “which item the court [regards as] properly subsumed in normal overhead.” As to Sheehan’s request for $199,200, representing 15% of the difference between the tender deposit and the final award, the court found that such an award would amount to allowing Sheehan to share in the assets of the debtor with the creditors; such a scheme, it said, “has no place in bankruptcy reorganization proceedings,” which “are primarily for the benefit of creditors.” The court appeared to conclude that the 15% bonus “was based on the prevailing practice in New Hampshire,” but
 
 *894
 
 found that appointed counsel for bankrupt estates are “officer[s] of the court and [their] compensation is not as in the private sector.”
 

 After rejecting the additional 15% award as inappropriate, the court resorted to the “lodestar” method to find reasonable compensation for Sheehan. Under this method, the number of reasonable hours worked is multiplied by a reasonable hourly rate.
 
 See, e.g., Hensley v. Eckerhart,
 
 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983);
 
 Furtado v. Bishop,
 
 635 F.2d 915, 919-20 (1st Cir.1980);
 
 In re Casco Bay Lines, Inc.,
 
 25 B.R. 747, 755-56 (Bankr. 1st Cir.1982). This so-called lodestar fee may then be adjusted up or down to take into account various factors — in cluding quality of representation, potential delay in payment, and the results obtained — as long as they are not already reflected in the basic fee.
 
 Blum v. Stenson,
 
 465 U.S. 886, 104 S.Ct. 1541, 1548-50, 79 L.Ed.2d 891 (1984);
 
 Miles v. Sampson,
 
 675 F.2d 5, 8 (1st Cir.1982);
 
 In re Casco,
 
 25 B.R. at 756.
 
 [1]
 
 In this case, the court determined that the hourly fees were reasonable as billed, and then adjusted them upward by a factor of almost 2.5 to an even $80,000 in light of Sheehan’s “imaginative” response to B & M’s title problems.
 

 Sheehan appeals, alleging that the district court failed to apply the proper legal standard in judging the reasonableness of its fee petition, and asking this court to reinstate its original request. Our standard of review in the present case is the usual “abuse of discretion, or error of law” standard for reviewing fee determinations of trial courts.
 
 See In re Casco,
 
 25 B.R. at 753;
 
 see also Furtado,
 
 635 F.2d at 920 (same standard for review of fees awarded under 42 U.S.C. § 1988).
 

 II.
 

 We begin by examining the former 11 U.S.C. § 205(c), which governs fee requests arising from railroad bankruptcy petitions filed before the enactment of the Bankruptcy Reform Act of 1978, 11 U.S.C. § 101
 
 et seq.
 
 Former § 205(c)(2) provided that “[t]he trustee or trustees and their counsel shall receive only such compensation from the estate of the debtors the judge may from time to time allow within such maximum limits as may be approved by the ICC as reasonable.” Similarly, § 205(c)(12) specified that “reasonable” attorney’s fees may be awarded by the reorganization judge within maximum limits fixed by the ICC. Although the ICC’s findings of fact, if “supported by evidence, may not be disturbed by a court,”
 
 Reconstruction Finance Corporation v. Bankers Trust Co.,
 
 318 U.S. 163, 170, 63 S.Ct. 515, 519, 87 L.Ed. 680 (1943);
 
 see also In re Boston & Providence Railroad Corp.,
 
 428 F.2d 159, 161 (1st Cir.1970), the court supervising the reorganization has broad discretion to determine reasonable fees.
 
 See, e.g., Dickinson Industrial Site, Inc. v. Cowan,
 
 309 U.S. 382, 389, 60 S.Ct. 595, 599, 84 L.Ed. 819 (1940);
 
 In re First Colonial Corp. of America,
 
 544 F.2d 1291, 1298 (5th Cir.)
 
 cert. denied,
 
 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977);
 
 In re Casco,
 
 25 B.R. at 753.
 

 Here the district court rejected Sheehan’s fees request, substituting an amount calculated under the lodestar method. The court was concerned that to grant the fee petition in full would produce a fee equal to six times the lodestar and at an hourly rate in excess of $500. But while we can appreciate the court’s concern, we think it abused its discretion in these rather unique circumstances. In our view, the court was trying to fit a square peg into a round hole. While calculation of the lode-
 
 *895
 
 star is a useful, and often a mandatory, starting point when the customary or agreed-upon fee is based on an hourly charge, it is not the sole benchmark for measuring the reasonableness of any and all attorney fees, regardless of their “mode and measure.”
 
 See Dunn v. H.K. Porter Co.,
 
 602 F.2d 1105, 1111 (3d Cir.1979).
 
 [2]
 

 There exist, after all, other permissible fee arrangements under which attorneys are retained, especially in certain legal specialties. Some of these nonhourly schemes are based, for example, on a percentage of the recovery;
 
 [3]
 
 others may depend on the value of the property that is being serviced.
 
 [4]
 
 Under such agreements, attorneys may at times receive fees that are greater than fees calculated on an hourly basis. But if bankrupts seeking to carry on a business are to obtain skilled legal services in certain areas, they may need the flexibility to make fee arrangements that are not based on hourly charges. Otherwise the ablest practitioners may be unwilling to represent them.
 
 [5]
 
 Percentage fee agreements may also enable bankrupts, with their limited financial resources, to minimize or even avoid legal fees unless the attorneys’ efforts actually increase the assets of the estate. And percentage arrangements, tied directly to the amount of recovery, may provide an incentive to maximize the sums recovered, to the ultimate benefit of the bankrupt estate. As the Third Circuit has observed, to require every fee award to pass the lodestar test would condemn these nonh-ourly arrangements “as per se unreasonable whenever [the] awards reach large amounts. This, we believe, would be inconsistent with the Canons of Ethics and relevant case law.”
 
 Dunn,
 
 602 F.2d at 1112;
 
 see also
 
 Model Code of Professional Responsibility EC 2-20, DR 2-106 & DR 5-103(A) (1979).
 

 The lodestar, we observe, was first developed for use by a court faced with the task of determining, for services already rendered, a fair attorney’s fee for parties who never retained — and therefore never negotiated a fee agreement with— the attorneys who now seek payment from them.
 
 See Lindy Brothers Builders, Inc. v. American Radiator & Standard Sanitary Corp,
 
 487 F.2d 161
 
 (Lindy I), appeal from decision on remand,
 
 540 F.2d 102
 
 *896
 
 (3d Cir.1976)
 
 (Lindy II).
 
 Where a plaintiff recovers a settlement for the benefit of an entire class, the lodestar is an equitable way to determine the share of attorney fees owed by beneficiaries of the fund who did not participate in the litigation.
 
 See generally
 
 Dawson,
 
 Lawyers and Involuntary Clients: Attorney Fees from Funds,
 
 87 Harv.L.Rev. 1597 (1974); Annot., 38 A.L.R.3d 1384 (1971) & A.L.R.3d Supp. (August 1985) (discussing cases involving the “common fund” doctrine in class actions). The same is true in cases involving “fee-shifting,” where the losing party is required to pay the attorney fees of the prevailing party.
 
 See generally Attorney Fee Shifting: A Symposium,
 
 47 Law & Con-temp.Probs. 354 (1984); Note,
 
 Surveying the Law of Fee Awards Under the Attorney’s Fees Awards Act of 1976,
 
 59 Notre Dame L.Rev. 1293 (1984) (summarizing law governing attorney fees under 42 U.S.C. § 1988 in civil rights litigation); Annot., 21 A.L.R.Fed. 750 (1974) & A.L.R.Fed.Supp. (Oct.1984) (discussing cases awarding attorney fees under 15 U.S.C. § 15 in civil antitrust litigation). In the absence of pri- or agreement, using the lodestar also conforms to professional expectations since litigation fees are quite often based on time charges.
 
 [6]
 

 The present context is quite different, however. According to the ICC’s undisputed finding of fact, the prevailing market rate in New Hampshire eminent domain proceedings is 50% of the difference between the state’s tender deposit and the commission’s final award. In a letter mailed to the trustees before Sheehan accepted the assignment, the firm proposed to reduce this to a fee of 15% of any amount in excess of the state’s offer plus hourly charges, in the belief that the market rate would “result in a disproportionately large fee” in this case. The trustees agreed to the proposed fee arrangement, believing, as one of them has testified, that it was “exceptionally satisfactory,” affording the railroad “a fair opportunity to employ these counsel and still make a substantial amount of money.” While all knew that the fee would be subject to later court approval, Sheehan had a legitimate expectation that the arrangement agreed upon in advance, would not be rejected by the court out of hand, especially when it proved to be so much lower than the fees customary in New Hampshire eminent domain cases.
 
 [7]
 
 That expectation was particularly logical if, as here, the fee were later approved in full by the ICC.
 

 The contingency aspect did not make the fee per se unreasonable in a bankruptcy reorganization. Contingent fees are, of course, of special concern to courts and are subject to strict judicial supervision.
 
 Dunn,
 
 602 F.2d at 1108. However, the district court’s concern that
 
 *897
 
 it would be inappropriate for attorneys to be “sharing in a common fund with creditors” was misplaced, in light of the judicial acceptance in other contexts of compensating attorneys from their client’s “common fund” that the attorneys’ efforts helped to create.
 
 See, e.g., Foshee v. Lloyds, New York,
 
 619 F.2d 1104, 1110 (5th Cir.1980);
 
 Lindy I,
 
 487 F.2d at 165-66;
 
 Natural Resources Defense Council, Inc. v. Environmental Protection Agency,
 
 484 F.2d 1331, 1333 (1st Cir.1973);
 
 In re Lyco Truck Sales & Service, Inc.,
 
 28 B.R. 408, 409 (Bankr.M.D.Pa.1982);
 
 but see In re Penn Central Transportation Co.,
 
 42 B.R. 657, 501 (E.D.Pa.1984),
 
 aff'd,
 
 771 F.2d 762, 1985-2 Trade Cas. (CCH) 11 66, 767 (3d Cir. Aug. 29, 1985). Contingency fees are sanctioned by the new Bankruptcy Code, 11 U.S.C. § 328, and, where appropriate, other courts have approved them, even in bankruptcy reorganization contexts.
 
 See, e.g., In re Land Investors, Inc.,
 
 544 F.2d 925 (7th Cir.1976);
 
 In re Bemporad Carpet Mills, Inc.,
 
 434 F.2d 988 (5th Cir.1970);
 
 In re Knudsen Brothers Dairy, Inc.,
 
 24 B.R. 418 (Bankr.D.Conn.1982).
 

 We recognize that the proposed fee was a “hybrid,” combining-both an hourly rate and a percentage award. The justification for a pure contingency fee — that the attorney assume the risk of receiving no compensation for his efforts — was not present. However, if the pure contingency fee of 50%, customary in New Hampshire eminent domain cases, had been chosen here, the result would have been a much higher fee than the one the attorneys now seek. In return for the lowered risk, Shee-han accepted a much lower contingency fee — 15%. Thus, Sheehan assumed the risk, indeed the likelihood, of receiving considerably less compensation than it might normally have received. And the trustees could believe that the 15%, being contingent upon the amount of additional moneys the attorneys brought in, would spur them to greater efforts that would ultimately benefit the railroad and its creditors. We do not think the arrangement was unreasonable in the circumstances simply because it combined two different forms of fee calculation.
 
 See In re Bemporad, supra,
 
 434 F.2d 988 (hourly fees plus $25,000 contingency award);
 
 In re Knudsen, supra,
 
 24 B.R. 418 (guaranteed 5% of damages offer plus Vs of any amount in excess of offer).
 
 [8]
 

 In determining that the fee petition was unreasonable, the court appears to have been influenced by the notion of strict economy, a concept prevalent under the Bankruptcy Act of 1898 (the “Act”), which was in effect at the time of B & M’s filing of bankruptcy. Under this principle, attorneys are “not expect[ed] to be compensated as generously for their services as they might be [if] privately employed.”
 
 In re First Colonial,
 
 544 F.2d at 1299.
 
 See also In re J.M. Wells, Inc.,
 
 575 F.2d 329, 331 (1st Cir.1978); 2 Collier on Bankruptcy II 330.05[2][e] (15th ed. 1985). Even, however, under this notion of frugality, courts have recognized the importance of awarding fees that are economical, not “parsimonious,” and liberal enough to attract competent counsel to bankruptcy work.
 
 In re First Colonial,
 
 544 F.2d at 1299. And the fee arranged here
 
 was
 
 lower than the 50% fee prevailing in the private market. Moreover, the principle of strict economy has been abandoned for reorganizations entered into after passage of the Bankruptcy Reform Act of 1978 (the “Code”). Under the Code, attorneys are entitled to fees “based on the time, the nature, the extent, and the value of such services
 
 and the cost of comparable services other than in a case under [the Bankruptcy Code], ”
 
 11 U.S.C. § 330(a)(1) (emphasis added).
 
 See
 
 H.R.Rep. No. 595, 95th Cong., 1st Sess. 329-30,
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad.News 5787, 6286; 124 Cong.Rec. H 11,089 (1978) (statement of Rep. Edwards),
 
 reprinted in
 
 1978 U.S.Code Cong. & Ad. News 6436, 6442. In light of this change,
 
 *898
 
 many of the subsequent cases considering fee petitions still governed under the old Act have tried to balance a spirit of economy on the one hand with fees sufficiently close to market rates to attract qualified counsel on the other.
 
 See Rose Pass Mines, Inc. v. Howard,
 
 615 F.2d 1083, 1092 & n. 10 (5th Cir.1980);
 
 In re Continental Investment Corp.,
 
 28 B.R. 972, 979 (D.Mass.1982);
 
 In re Pacific Far East Line, Inc.,
 
 458 F.Supp. 771, 775-76 (N.D.Calif.1978), aff
 
 'd in part and rev’d on other grounds,
 
 654 F.2d 664 (9th Cir.1981);
 
 In re Citizens Mortgage Investment Trust,
 
 37 B.R. 813, 820 (Bankr.D.Mass.1984). While we acknowledge that economy remains a valid consideration in this case, we also believe that true economy necessarily requires attention to the market rate.
 

 To be sure, it was altogether proper for the district court to be concerned about the interests of creditors. But cutting the fee as ordered would, we think, harm these interests in the long run by undermining a bankrupt railroad’s ability to recruit capable counsel and thereby to attain its goal of successful reorganization. We are told that the B & M is one of the few, perhaps the only, bankrupt railroad in the nation to have succeeded in returning to private ownership, and that the successful outcome of the eminent domain proceeding here was a significant step in this process. When the legal work involves not ordinary administrative matters peculiar to bankruptcy but matters in which any enterprise — whether or not in reorganization— may become involved,
 
 see In re Certain Special Counsel,
 
 737 F.2d at 118-19, trustees must be able to bid against other businesses for the services of the ablest and most experienced attorneys,
 
 [9]
 
 whose expertise may make the difference between success and failure in reorganizing the business and getting out of bankruptcy.
 
 [10]
 
 Economy cannot be simply “an exercise in false economy.”
 
 In re Lloyd, Carr & Co.,
 
 2 B.R. 714, 716 (D.Mass.1979).
 

 When Sheehan’s fee arrangement is compared with the prevailing market- rate in New Hampshire eminent domain proceedings of 50% of the difference between the state’s tender deposit and the Commission’s final award, the fee appears eminently reasonable. While it would have been theoretically possible for the arrangement agreed to by Sheehan and the trustees to have produced a higher fee than the market rate (if, for example, the final award did not exceed the tender offer), the clear intent of the parties was to reduce Shee-han’s fee below the market rate. In fact the final fee of $232,310 was only 35% of the $664,000 the market rate would have produced.
 
 [11]
 
 To deny the fee now because it exceeds time charges and looks high
 
 in hindsight
 
 would penalize Sheehan for a job well done and would tell Sheehan and all other attorneys that they should think
 
 *899
 
 twice before again working for businesses in reorganizations.
 
 See Brobeck, Phleger & Harrison v. Telex Corp.,
 
 602 F.2d 866, 875 (9th Cir.),
 
 cert. denied,
 
 444 U.S. 981, 100 S.Ct. 483, 62 L.Ed.2d 407 (1979) (while $1 million minimum fee was “clearly high,” client received services of “substantial value,” and the fairness of a fee agreement should be “determined with reference to the time when the contract was made”).
 

 After examining the fee arrangement in light of other relevant factors,
 
 King v. Greenblatt,
 
 560 F.2d 1024, 1026-27 (1st Cir.1977),
 
 cert. denied,
 
 438 U.S. 916, 98 S.Ct. 3146, 57 L.Ed.2d 1161 (1978);
 
 Johnson v. Georgia Highway Express, Inc.,
 
 488 F.2d 714, 717 (5th Cir.1974), we hold that it is reasonable and see no reason to adjust it. Sheehan brought to the task a high degree of both experience and expertise in what is considered a rather specialized legal undertaking. The outcome of this type of case may depend as much on the confidence which state officials and judges have in the retained attorneys as in the accuracy per se of their legal work. Moreover, as the district court acknowledged, petitioner responded imaginatively to two difficult legal challenges, both of which were vital in obtaining a high damages award. Because of Sheehan’s efforts, B & M won an award of $2,328 million, at least $1,328 million more than the Commission’s original offer. In this light, 15% of the additional award is a reasonable share of a sum that might not otherwise exist if not for Sheehan’s efforts. We recognize also that there has been considerable delay in the receipt of payment for services rendered — over five years since the fee petition was originally filed with the district court.
 
 See, e.g., Copeland v. Marshall,
 
 641 F.2d 880, 893 (D.C.Cir.1980);
 
 Lindy II,
 
 540 F.2d at 117. Finally, in light of the ICC’s expertise and the role assigned to it under § 205(c) to establish the maximum limits of compensation,
 
 In re Boston & Providence,
 
 428 F.2d at 161, 163, its conclusion that the requested fees were reasonable should have been given due weight by the district court. And to the extent that the court’s decision rested on a rejection of the ICC’s finding that the normal fee is 50%, it rested on the legal error of failing to accept, absent contrary evidence, the factual findings of the ICC.
 

 Although none of the factors that we have discussed above is dispositive, when they are taken together, we conclude that the fee arrangement was reasonable. We hold, therefore, that the court’s decision to reduce Sheehan’s fee by 66% was an abuse of discretion. Since Sheehan does not appeal from the district court’s reduction in its requested expenses, we
 
 affirm the judgment of the district court as to petitioner’s expenses, and otherwise reverse and remand with instructions that the court award petitioner its requested fees.
 

 [1]
 

 . After
 
 Blum,
 
 however, the fee applicant’s burden of justifying an upward adjustment of the lodestar is quite high. Absent exceptional circumstances, such considerations as the novelty and complexity of issues presented, high quality of representation, and successful results obtained should have been taken into account in setting the lodestar fee itself — obviating the need for further adjustment based on those same factors. 104 S.Ct. at 1548-50;
 
 see also Wildman v. Lerner Stores Corp.,
 
 771 F.2d 605, 610-11 (1st Cir.1985);
 
 Garrity v. Sununu,
 
 752 F.2d 727, 739 (1st Cir.1984).
 

 [2]
 

 . Despite the widespread use of the lodestar method by courts determining reasonable fees, some observers have recognized that this method of calculation is not without drawbacks. For example, because the lodestar rewards higher fees for more hours reasonably spent, it may sometimes have the undesirable effect of giving attorneys an incentive to prolong litigation.
 
 See, e.g., In re “Agent Orange" Product Liability Litigation,
 
 611 F.Supp. 1452, 1461 (E.D.N.Y.1985).
 

 [3]
 

 . For a sample of contingent fee agreements promising attorneys a share of any recovery won,
 
 see McKenzie Construction, Inc. v. Maynard,
 
 758 F.2d 97, 99-102 (3d Cir.1985) (contract dispute);
 
 Hoffert v. General Motors Corp.,
 
 656 F.2d 161, 162-65 (5th Cir.1981),
 
 cert. denied,
 
 456 U.S. 961, 102 S.Ct. 2037, 72 L.Ed.2d 485 (1982) (products liability);
 
 Foshee v. Lloyds, New York,
 
 643 F.2d 1162, 1164-65 (5th Cir.1981) (novel tort claim);
 
 Liberty Mutual Ins. Co. v. Ameta & Co.,
 
 564 F.2d 1097, 1105 (4th Cir.1977) (personal injury);
 
 Farmington Dowel Prods. Co. v. Forster Mfg. Co.,
 
 436 F.2d 699, 701 (1st Cir.1970) (civil antitrust);
 
 Lightsee v. First Nat’l Bank,
 
 132 So.2d 776, 777 (Fla.Dist.Ct.App.1961),
 
 cert. denied,
 
 138 So.2d 334 (1962) (collection of note).
 
 See generally
 
 MacKinnon,
 
 Contingent Fees for Legal Services
 
 (1964); Corboy,
 
 Contingency Fees: The Individual's Key to the Courthouse Door,
 
 Litigation, Summer 1976, at 27; Leubsdorf,
 
 The Contingency Factor in Attorney Fee Awards,
 
 90 Yale L.J. 473 (1981).
 

 [4]
 

 . The value of the estate typically plays a significant role in determining fees for probate work and time is less important as a factor than in other fields.
 
 See generally
 
 Annot., 58 A.L.R.3d 317 (1974) & A.L.R.3d Supp. (August 1985) (discussing attorney fee cases involving wills and estate administration). In legal work involving real estate work, the value of the property involved also plays an important role in determining the proper fees.
 
 See generally
 
 Annot., 58 A.L.R.3d 201 (1974) & A.L.R.3d Supp. (August 1985) (discussing attorney fee cases involving real estate).
 

 [5]
 

 .
 
 Cf. In re Knudsen Bros. Dairy, Inc.,
 
 24 B.R. 418, 420 (Bankr.D.Conn.1982) (observing, with regard to a fee based on a percentage of the difference between tender offer and final award, that it was "highly unlikely” that a party "could have obtained the services of competent counsel in the highly technical area of eminent domain litigation on any other fee basis").
 

 [6]
 

 . It is interesting that in dealing with fee awards under 42 U.S.C. § 1988 where the prevailing party and his counsel have agreed to a contingent fee contract, some circuits have refused to limit attorney fees to the amount calculated under the lodestar, reasoning that when the parties have "fairly contracted to establish a fee, the contract represents their notion of a reasonable fee” and should be enforced if reasonable.
 
 See Hamner v. Rios,
 
 769 F.2d 1404 (9th Cir.1985) (requiring prevailing party to pay difference between statutory award and contingent fee);
 
 Pharr v. Housing Authority,
 
 704 F.2d 1216 (11th Cir.1983) (requiring losing party to pay the difference). We express no opinion as to whether or not we would accept these courts’ reasoning in similar circumstances.
 

 [7]
 

 . Former Bankruptcy Rule 215, which governed the employment of attorneys at the time Shee-han was engaged, did not require the prior approval by the reorganization court of any fee agreement between the trustees and their counsel. We note, however, that the new Bankruptcy Rule 2014 now requires trustees seeking court approval of employment of counsel to specifically state in their application,
 
 inter alia,
 
 "any proposed arrangement for compensation.” Such prior approval will give attorneys like Sheehan some assurance, before they invest time and money, that their fee arrangement is at least not unreasonable on its face. Moreover, reorganization courts will be better informed when deciding whether to approve the employment of certain counsel to trustees. It is our hope that in future cases this rule will prevent a fee petition from spawning a “second major litigation,”
 
 Hensley v. Eckerhart,
 
 461 U.S. 424, 437, 103 S.Ct. 1933, 1941, 76 L.Ed.2d 40 (1983) —a hope frequently expressed but not sufficiently fulfilled.
 

 [8]
 

 .
 
 See generally
 
 Clermont & Currivan,
 
 Improving on the Contingent Fee,
 
 63 Cornell L.Rev. 529 (1978) (criticizing both the pure hourly fee and pure percentage fee, and advocating instead a hybrid arrangement based on the hours worked and amount recovered).
 

 [9]
 

 . Indeed, one of the trustees, Robert Meserve, commented during the hearing before the district court on August 29, 1984 that: "it's absolutely true, of course, this is the B & M. It’s a bankrupt railroad. It’s not General Motors Corporation or General Electric. All that is true. On the other hand, we compete in the market for securing the services of counsel. We compete with General Motors and General Electric. If counsel can get from those people a substantial amount of money more than the Boston & Maine can pay, I don’t know why counsel [would take] on the business of representing the Boston & Maine.”
 

 [10]
 

 . We emphasize that we see a substantial difference between the present case and a routine bankruptcy, even a routine reorganization. We do not suggest that fee arrangements of this nature would necessarily be permissible in many other circumstances. We are talking here of a bankrupt railroad, battling for survival, whose trustees shrewdly hired certain highly qualified attorneys to try to secure better compensation for a taking of railroad property that the B & M had itself valued for a relatively small sum. Nothing herein is to suggest that we will approve percentage fees calculated without reference to hours and energy expended in routine bankruptcy situations.
 

 [11]
 

 .Indeed, taking $33,000 as a reasonable estimate of what Sheehan’s hourly billing might have been estimated to be, any award by the Commission in excess of $1,094,000, or put another way, any increase of the tender deposit exceeding 9.4%, would have left the trustees better off under the arrangement agreed to than under market rates.