**In re WHET, INC., Debtor.**

**Bankruptcy No. 80–1542–HL.**

United States Bankruptcy Court,
D. Massachusetts.

April 8, 1986.

Gordon W. Hatheway, Jr., Pierson, Ball & Dowd, Washington, D.C., for trustee.

John F. Cullen, Cullen & O'Connell, Boston, Mass., successor trustee.

Jon D. Schneider, Goodwin, Procter & Hoar, Boston, Mass., for trustee, David J. Ferrari.

## MEMORANDUM ON FEE APPLICATION OF PIERSON, BALL & DOWD

HAROLD LAVIEN, Chief Judge.

The background of this fee application exemplifies the contrast that, unfortunately, occurs in this case: a high degree of professionalism by counsel in the face of a type of harassment and intimidation that exceeds the bounds of normally anticipated advocacy and common civility even when presented pro se.

The firm of Pierson, Ball & Dowd was hired, originally, by the state court receiver in August of 1980 and then, by the trustee, to handle the specialized tasks of providing for the operation of this AM radio station by the receiver, then the trustee, and the ultimate transfer of the license to the suc-

cessful purchaser. Proceedings before the F.C.C. are, of course, technical and best handled by those specializing in such matters and, therefore, able to discharge the task in a proficient manner at a reasonable cost. In this matter, the wisdom of retaining Pierson, Ball & Dowd became manifest as Anthony R. Martin-Trigona, the former principal of the debtor corporation, WHET, Inc., with and without counsel, filed a myriad of objections, appeals, and assorted miscellaneous pleadings. During the three years that the matter was before the F.C.C., counsel was required to prepare, analyze, and respond to over 120 pleadings, memoranda, letters, and other docket entries.

Because of Mr. Martin-Trigona's actions, the firm, has been required to respond to protracted proceedings before the Commission and appeals to the U.S. Court of Appeals for the District of Columbia Circuit; a lawsuit against the firm, its members, and certain of its employees filed in the U.S. District Court for the Southern District of New York alleging civil racketeering claims; Mr. Martin-Trigona's appeal to the U.S. Court of Appeals for the Second Circuit of the Southern District's dismissal of the RICO action; a carbon copy of the Southern District RICO suit subsequently filed by Mr. Martin-Trigona in the U.S. District Court for the District of Columbia; an appeal of the dismissal of that action to the U.S. Court of Appeals for the District of Columbia Circuit, and other post-dismissal proceedings; a similar lawsuit brought by Mr. Martin-Trigona on behalf of WHET, Inc., in the same district for recovery of interim fees paid to the firm as authorized by this Court; the imposition of *lis pendens* against the real property of members and employees of the firm and other persons in the Washington, D.C. metropolitan area having the same names as firm members and employees; litigation to remove such liens; proceedings in the U.S. District Court for the District of Connecticut and appeals therefrom, all arising out of Mr. Martin-Trigona's suits against the firm, its members, and employees; publication of such lawsuits in the District of Columbia

legal publications; and transactions with professional liability insurers necessitated by the foregoing lawsuits.

In 1983 and 1984, Mr. Martin-Trigona prosecuted appeals from the Commission's decisions in the U.S. Court of Appeals for the District of Columbia Circuit. The firm was even required to litigate with Mr. Martin-Trigona such frivolous actions as whether the trustee was entitled to intervene as a party-appellee (appeals of Commission decisions are brought against the Commission), substitution of the acting trustee, Mr. Cullen, for the former trustee, Mr. Ferrari, as a party, the propriety of Mr. Cullen's appointment as trustee, and the validity of the bond posted by him. Personal vindictiveness between or toward counsel is never appropriate; however, its appropriateness is even less understandable against Pierson, Ball & Dowd. After all, unlike the trustee or his counsel, they were not making policy decision—they were simply carrying out the trustee's instructions— yet, the aforementioned abuses occurred.

At the same time Mr. Martin-Trigona filed his action in the Southern District of New York, he simultaneously filed notices of *lis pendens* in four suburban jurisdictions contiguous to the District of Columbia. The indiscriminate manner in which Mr. Martin-Trigona filed these notices resulted in circumstances whereby any person owning any real estate in any of these jurisdictions and who suffered from the coincidence of having the same first and last names (Judith Harris and John Duffy) as one of the defendants in the Southern District litigation was subject to the lien. Initially, one partner and one associate of the firm each were delayed in accomplishing routine personal real estate transactions because of these liens. These unfortunate events occurred *after* Mr. Martin-Trigona's suit was dismissed and the dismissal was affirmed. It was necessary to institute a separate action in Fairfax County, Virginia, to remove these liens. When these latter events occurred, the firm wrote Mr. Martin-Trigona in an attempt to have him release the now stale *lis pendens* no-

tices. Because of his refusal to remove these liens, the firm was required to undertake mandamus litigation to do so.

The total fee for legal services requested for the period, November 1980 to date, is $116,580 and $10,409.87 in out-of-pocket expenses. An interim award of $25,000 was made on August, 1983. Counsel also asks for an appropriate adjustment in the lodestar, due to the difficult and extraordinary unpleasantness in dealing with Anthony R. Martin-Trigona, as well as the following: the professional embarrassment caused by the *lis pendens*, the report required to be filed with the firm's malpractice insurers, the unfavorable reflection on their professional standing caused by public notice of their being sued under the RICO statutes, and the affect on morale in the firm of the accusations of fraudulent conduct or crookedness.

█ Fourteen (14) attorneys put in 916.4 hours, six legal assistants, 101.4 hours, plus an additional 36.9 hours of three attorneys, 41 hours of legal assistants' time in preparing a very detailed fee application and supplement, thereto. The rates of the attorneys over five years, November 1980 to December 1985, ranged from $150 to $215. The paralegals ranged from $30 to $55. Six of the attorneys' time ranged .8 hours to 20.9 hours, and four had over 100 hours. The average hourly rate for the attorneys is $116 per hour, and for the paralegals, $43 per hour.

Under the circumstances, and in view of quality of work performed, all of which was necessary, I find the hours expended, and rates fair and reasonable, with the following exceptions.

█ The purchaser of the station required and was given an opinion letter by both the trustee's counsel and this firm. Fourteen (14) hours, at $150 per hour, was attributed to that task. Since the basic information was supplied by the trustee and the firm's opinion concerned their F.C.C. specialty, I find five hours is a reasonable time for this task and, thereby, deduct $1,350. Counsel charged 40 hours

at $75 per hour for research on venue. While recognizing the importance of the issue and commending the use of a junior for the research, the issue was not complicated. The firm had minimal contacts with New York. Twenty (20) hours is a reasonable amount of time for this research and, therefore, $1,500 is deducted. There is a four hour charge at $75 per hour for travel to New York to file papers. Assuming the importance of doing this by counsel rather than by messenger we, customarily, allow travel at half rate, *Macera v. Pagan*, 698 F.2d 38 (1st Cir.1983); thus, $150 will be deducted. Thirty-four (34) hours is charged for preparing a final order. One of the reasons for using several attorneys was to capitalize on their respective expertise. Certainly, with both trial and appellate counsel, it should not take more than 10 hours to prepare a final order. Since this was charged at $130 per hour, I have deducted $3,120. Finally, $7,652 is requested for preparation of the fee application. The Ninth Circuit in a Civil Rights case, *In re Nucorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985), determined that the cost of preparing fee applications is compensable because of the Court's requirements for extensive detail. Judge Murray, in a recent U.S. District Court for the District of Massachusetts bankruptcy opinion, determined that as the fee petition was of no benefit to the estate, no compensation was allowable. *B & M Corp.*, 51 B.R. 995 (D.Mass.1985). In my view, both opinions go too far. A private client presented with a six-figure bill would expect substantial detail, so that compensation should only be considered for the extra work, and if contemporaneous time records are kept, the assembling of that information is not a major undertaking. I, therefore, in the absence of more specific explanations but mindful of the extensive detail supplied, will allow half of the charges, or $3,826. All of these deductions total $9,946, reducing the fee to $106,634, and attorneys' hours 878.8, and paralegal hours 121.5, making the average hourly legal rate $115 and the average paralegal rate, $43 for an effective hourly firm rate of $106. To this lodestar of $106,634, I have allowed

an upward adjustment of 15% or $15,-995.10, making the total allowable fee of $122,629.10.

 Expenses total $10,409.87 which include $3,115.32 for xeroxing at 12 cents a copy. Based on the U.S. Trustee's survey of the cost of copies commercially made and the savings in secretarial time in not using carbon paper, I allow 6 cents a copy, thereby reducing the allowable xerox expense $1,557.66, making the allowable expenses, $8,852.21.

Since an interim allowance of $25,000 has previously been paid, the total net amount due is $106,481.31.

A hearing on this fee application was originally noticed out to all creditors and the trustee, the U.S. Trustee, and scheduled for March 31, 1986 at 10:00 A.M. As a result of a memorandum issued by the Court on February 13, 1985, a supplement providing additional breakdown of the work performed was filed on March 14, 1985. Attorney Edward Suskin, representing some creditors, requested some additional information which was made available, and Mr. Martin-Trigona, based on an appearance before the Second Circuit, requested a different date and, after telephone conference with Attorney Suskin, who indicated a desire to attend the hearing, it was scheduled for 9:00 A.M., April 1, 1986. At 9:00 A.M., Attorney Suskin called and advised the Court he would not be appearing; however, anticipating that an attorney would be present to voice an objection, Pierson, Ball & Dowd was advised that they should be prepared for an evidentiary hearing. Although the notice of the fee hearing required written opposition to be filed, none were filed. With no attorney or party in interest present, and no written objection having been received, a formal evidentiary hearing was not held. Instead, the normal and usual fee hearing took place with the Court considering the application and the oral presentation of counsel in light of the Court's knowledge of the activities of counsel and its ability, on and off the bench, to evaluate the need and value of counsel's services.

The court, either trial or appellate, is itself an expert on the question (of attorney's fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value. *The matter of TMT Trailer Ferry, Inc.*, 577 F.2d 1296 (5th Cir.1978); *Mesapetroleum Co. v. Coniglio*, 629 F.2d 1022, 1030 (5th Cir. 1980); *see also, Woftkowski v. Cade*, 725 F.2d 127 (1st Cir.1984).

Both the trustee, Mr. Cullen, and the former trustee's counsel, Mr. Schneider, attended the hearing and each recommended allowance of the fee request as being reasonable in hours and amount and encompassing necessary legal services. The U.S. Trustee did not attend but submitted a written form recommending allowance of the fee request, as submitted.

 Mr. Anthony R. Martin-Trigona appeared and sought to participate in objections to the fee request. From the papers he had filed, including the fifteenth motion for me to recuse myself from the fee hearing, he characterized himself as "President WHET, Inc., Reorganized Post-Confirmation Debtor." The Court advised Mr. Martin-Trigona that he had no standing—this had been the determined by this Court, *In re WHET, Inc.*, Memorandum on Standing of Anthony R. Martin-Trigona, 33 B.R. 438 (Bankr.D.Mass.1983), supported on appeal by the District Court and the Court of Appeals. Further, he signed his objections as the representative of the debtor corporation; however, in this Circuit, a corporation can only be represented by an attorney. *Anthony R. Martin-Trigona and WHET, Inc. v. David J. Ferrari*, 750 F.2d 149 (1st Cir.1984); *In re Las Colinas Development Corp.*, 585 F.2d 7 (1st Cir.1978), *cert. denied*, 440 U.S. 931, 99 S.Ct. 1268, 59 L.Ed.2d 487 (1979). Since Mr. Martin-Trigona was an interested party, if not a party in interest, the Court, as a matter of courtesy, allowed him to make an oral argument against the fee request.

 Mr. Martin-Trigona objected to any allowance on the basis that there were no

contemporaneous time records. The First Circuit has minced no words in its insistence that time records be kept contemporaneous with the services so that the time spent could be described in a manner that would enable the Court to make evaluations as to the reasonableness of time spent on each task without, itself, becoming immersed in a hopeless accounting morass. *In re Grendel's Den, Inc.*, 749 F.2d 945 (1st Cir.1984). In this application, the initial daily logs going back to 1980 are not available. However, the combination of computer print-out sheets and the further detailed analysis by attorneys, which breaks their work down into 16 tasks with detail as to who worked on which of the 16 tasks and time spent, substantially, meets with the purpose of enabling the Court to make its judgments. In the future, attorneys may be well advised to retain their initial daily logs in the event that opposition develops at a fee hearing requiring an adversary evidentiary hearing.

■ A second basis asserted by Mr. Martin-Trigona for denying the firm any fees is what he phrased as "undisclosed fraud on the Court" by the counsel's failure to advise the Court that he represented other radio stations within 50 miles of Boston. There was no conflict of interest in the firm representing the debtor corporation and other stations in the surrounding area, since there was no adversarial claim against the transfer of the radio station license to the buyer. Except for Anthony R. Martin-Trigona's opposition, someone counsel did not represent, the task would have been fairly routine for F.C.C. specialists. The eight other stations did not compete for the license, nor is there any indication that counsel had to make choices, hard or otherwise, because of any conflicting interests. There is no indication or claim that any of counsel's services were protracted or compromised, because of its other uninvolved clients.

Substantially, the balance of Martin-Trigona's criticism of the fee request was based on the size of the fee with an apparent refusal to recognize that he was directly the cause.

This case, including the portion attributed to this law firm, has been overly prolonged and should have been closed years ago without the need of most of these legal fees, but that is not the fault of these attorneys. It is unfortunate for all concerned that the forecasts of this Court, concerning the effect of Mr. Martin-Trigona's tactics, *In re WHET, Inc.*, 33 B.R. 424, 434 (Bankr.D.Ma.1983) repeated in Footnote 3 in *U.S.A. v. Anthony R. Martin-Trigona*, 759 F.2d 1017 (2d Cir.1985) and, most recently, *In re Krisle*, 13 B.C.D. 780, 791, 54 B.R. 330 (Bankr.S.Dakota 1985), have proven true.

The result is that the accusations increase, the motions, pleadings, complaints and suits multiply, courts and lawyers are buried in mountains of time-consuming paper. If there is one truth, it is that the estate will be bled white by the costs and legal fees engendered by his 'crusade.'

As has been pointed out *In re Thomas, Inc.*, 43 B.R. 510, 512 (Bankr.D.Mass.1984): ('Obviously, the more stubborn the opposition the more time would be required'); *Perkins v. New Orleans Athletic Club*, 429 F.Supp. 661, 667 (E.D.La.1976) ('Those who elect a militant defense ... [are responsible for] the time and effort they exact from their opponents.').

The lodestar we observe was first developed for use by a court faced with the task of determining, for services already rendered, a fair attorney's fee for parties who never retained—and therefore never negotiated a fee agreement with—the attorneys who now seek payment from them. *B & M v. Sheehan, Phinney, Bass & Green*, 778 F.2d 890 (1st Cir. 1985).

In determining the fee, the Court should not be
"... influenced by the notion of strict economy, a concept prevalent under the Bankruptcy Act of 1898 (the "Act"), which was in effect at the time of *B & M's* filing of bankruptcy. Under this principle, attorneys are 'not expect[ed] to be compensated as generously for their services as they might be [if] privately

employed.' *In re First Colonial*, 544 F.2d [1291] at 1299. *See also In re J.M. Wells, Inc.*, 575 F.2d 329, 331 (1st Cir. 1978); 2 Collier on Bankruptcy ¶ 330.-05[2][e] (15th ed. 1985). Even, however, under this notion of frugality, courts have recognized the importance of awarding fees that are economical, not 'parsimonious,' and liberal enough to attract competent counsel to bankruptcy work. *In re First Colonial*, 544 F.2d at 1299.

\* \* \* \* \* \*

Moreover, the principle of strict economy has been abandoned for reorganizations entered into after passage of the Bankruptcy Reform Act of 1978 (the 'Code'). Under the Code, attorneys are entitled to fees 'based on the time, the nature, the extent, and the value of such services *and the cost of comparable services other than in a case under [the Bankruptcy Code]*,' 11 U.S.C. § 330(a)(1) (emphasis added). *See* H.R.Rep.No. 595, 95th Cong., 1st Sess. 329–30, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6286; 124 Cong.Rec. H 11,089 (1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Ad. News 6436, 6442. In light of this change, many of the subsequent cases considering fee petitions still governed under the old Act have tried to balance a spirit of economy on the one hand with fees sufficiently close to market rates to attract qualified counsel on the other. *See Rose Pass Mines, Inc. v. Howard*, 615 F.2d 1088, 1092 & n. 10 (5th Cir.1980); *In re Continental Investment Corp.*, 28 B.R. 972, 979 (D.Mass.1982); *In re Pacific Far East Line, Inc.*, 458 F.Supp. 771, 775–76 (N.D.Calif.1978), *aff'd in part and re'd on other grounds*, 654 F.2d 664 (9th Cir.1981); *In re Citizens Mortgage Investment Trust*, 37 B.R. 813, 820 (Bankr.D.Mass.1984). While we acknowledge that economy remains a valid consideration in this case, we also believe that true economy necessarily requires attention to the market rate.

*B & M v. Sheehan, supra*, 778 F.2d at 897.

The procedure for computing the lodestar is spelled out by the First Circuit in *B & M Corp. v. Moore*, 776 F.2d 2, 6 and 7 (1st Cir.1985).

Under the methodology pioneered by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Sanitary Corp.*, 487 F.2d 161 (3rd Cir.1973) ("Lindy I"), and adopted by this circuit in *Furtado v. Bishop*, 635 F.2d 915, 919–20 (1st Cir.1980), the fee-setting court first establishes a "threshold point of reference" or "lodestar", which is the number of hours reasonably spent by each attorney multiplied by his reasonable hourly rate. *See, e.g., Grendel's Den, Inc. v. Larkin*, 749 F.2d 945, 950 (1st Cir.1984). This lodestar can then be adjusted up or down to reflect a variety of factors, such as delay in payment, quality of representation, and the results obtained, if they have not already been taken into account in computing the lodestar. *See, e.g., Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984); *Miles v. Sampson*, 675 F.2d 5, 8 (1st Cir.1982); *Furtado*, 635 F.2d at 920.

To determine the number of hours 'reasonably' spent, as well as in setting a 'reasonable' hourly rate, a court must review the work to see whether 'counsel substantially exceeded the bounds of reasonable effort,' *Pilkington v. Bevilacqua*, 632 F.2d 922, 925 (1st Cir.1980), and should disallow hours that were 'duplicative, unproductive, excessive, or otherwise unnecessary.' *Grendel's*, 749 F.2d at 950. *See also Hensley*, 461 U.S. at 434, 103 S.Ct. at 1939–40; *Wojtkowski v. Cade*, 725 F.2d 127, 130 (1st Cir.1984). In setting the lodestar, a court is also expected to consider a variety of factors, including the 'type of work performed, who performed it, the expertise that it required, and when it was undertaken.' *Grendel's*, 749 F.2d at 951; *see also Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984); *In re Casco*, 25 B.R. at 755.

As to fees, generally, it has been stated that:

Consideration should also be given to specialized counsels' understandable expectations that their bills, if reasonable, will not be unduly parsed and to the adequacy of fees necessary in attracting the most competent counsel, particularly when the legal work was of a kind that could arise as well in a nonbankruptcy context. *See Boston & Maine v. Sheehan*, 778 F.2d at 894–98; *Boston & Maine Corp. v. Moore, supra* 776 F.2d at 7.

In this case, the work for which counsel was engaged was essential to the consummation of the sale of the radio station. It serves no useful purpose to engage in the intellectual distinction of whether the license is property of the estate. Regardless of how they are defined, liquor licenses, radio licenses, and other similar rights

are, in fact, the principal value in a sale of a business, however it may be characterized, and are, in fact, the *sine qua non* of the sale of the estate's assets. This sale was expressly conditioned on the transfer of the station's license. Counsel accomplished that task, allowing the consummation of the sale, all to the benefit of the estate, in the face of harassment, character assassination, affronts to their professional competence, repeated groundless suits—some, in distant forums, unfavorable and demeaning publicity, reports of RICO conspiracy that had to be reported and evaluated by insurance carriers, *lis pendens* tying up of property of the firm's members and even unrelated individuals of similar names to those of firm members.[1] These harassments were coupled with a decline in the firm's morale and an adverse affect on the firm's reputation in the legal community and among clients, extending over a

1.

February 28, 1984
Gordon Hatheway, Jr.
Pierson Ball & Dowd
1200 18th Street, NW
Washington, DC 20036
Dear Mr. Hatheway:
This will respond to your letter of February 24, 1984.
Your request is rejected *in toto.*
Your claims that "innocent third parties" have been injured is strage unless you represent them. What basis do you have for this claim. If they have been injured, they should contact me directly, and not deal through a crook like you. I do not believe a word you say.
Second, if you want to sue me, go ahead. I will take appropriate measures to protect my interests If filed in the state courts, I may remove it to the federal courts. Moreover, if you sue me, this will give me a chance to counterclaim and raise my claims against you and your law firm, which claims I have been temporarily blocked from prosecuting by the actions of Crazy Joey in Connecticut. Thus, I *invite* you to sue me, because you will open the door to my suing you in return without having to secure leave of court to proceed. Be my guest.
Third, the relief you seek is futile. I am shortly going to record *lis pendens* notices from the District of Columbia case, and you will have the same problem until that case is resolved by Judge Green.
I suggest that the only way your law firm is going to be rid of me is to (a) return the stolen money you received last August from Ferrari; (b) resign as trustee counsel and (c) waive any compensation and (d) pay me for my losses as

well, as part of an overall settlement. Short of that, we are in bed together until the U.S. Supreme Court rule on the various law suits among and between us.
Your law firm acted corruptly, and will be brought to justice before the bench of justice because of its corruption. The case before Judge Green is still pending, and presents another opportunity to lodge lis pendens notices, which is precisely what I propose to do.
Indeed, should the Crazy Joey injunction be modified, Judge Green's permission will not be needed to proceed, and the case will be before her. Perhaps I should have recorded my lis pendens notices sooner; perhaps not. But you are stuck with my claims until they are either settled or resolved in a court of last resort, which looks like a long way off.
Finally, I view the old lis pendens notices as viable; the court only ruled on venue. I refiled in a court of proper venue. While I might amend the original lis pendens notices, they are still viable public notices of my claims against you, your law firm, and others. You also claim that associates should be dismissed. That was my old position. I gave you a chance to let them out of the case *before* it was filed and you ignored the chance. I think that they may as well stay in. They are all part of the same crooked law firm, and should be liable.
You are free not to settle, and to obstruct the administration of justice, as you have done. But history teaches that (a) I am a very patient, very plodding, very persistent person where my rights have been violated and (b) while I usually lose before trial judges, I often win cases on appeal. In my opinion, you and you law firm are nuts to let my claims against you pend and

period of four or five years, during which fees, overhead, and out-of-pocket expenses mounted, with only a small interim payment, and that resulting in Mr. Martin-Trigona bringing, yet, another law suit.

While the undesirability of the case and the opposition encountered are factors to be considered in establishing the lodestar, *In re Casco Bay Lines, Inc.*, 25 B.R. 747 (Bankr.App.Mass.1982), the abuse encountered by counsel was above and beyond anything a law firm should have to contend with [2] and warrants a 15% enrichment of the lodestar.

Counsel's fee of $122,629.10 is allowed as reasonable for the necessary legal services rendered, and $8,852.21 are allowed as out-of-pocket disbursements. Since $25,000 has been paid as an interim fee, the net additional allowance to counsel is $106,-481.31. Unfortunately, the determination as to whether this is an interim allowance or a final allowance will depend on the legal work created by the further activity of Mr. Anthony R. Martin-Trigona.

go on, because in the end you are going to be liable for a very substantial amount of money. Nevertheless, this is a free country, and you do as you feel you must, and I will do likewise.

Your obediant servant,

/s/ Anthony R. Martin-Trigona

ANTHONY R. MARTIN–TRIGONA

ARMT:sp

2. For the most recent description of what one encounters when Anthony R. Martin-Trigona is your opponent, *see, In re Anthony R. Martin-Trigona v. Belford, Trustee, et al*, 781 F.2d 36 (2nd Cir.1986).