**In re WHET, INC., Debtor.**

**Bankruptcy No. 80–1542–HL.**

United States Bankruptcy Court,
D. Massachusetts.

Feb. 13, 1986.

Memorandum On Interim Fee, etc.
Feb. 25, 1986.

Jon D. Schneider, Goodwin, Procter & Hoar, Boston, Mass., for Former Trustee, David Ferrari.

John F. Cullen, Cullen & O'Connell, Boston, Mass., Successor Trustee.

Gordon W. Hatheway, Jr., Pierson, Ball & Dowd, Washington, D.C., Sp. Counsel to Trustee.

Edward R. Suskin, Libertyville, Ill., for creditors Donna Wolske, SLJ Communications, Inc. and Affiliated Intern. Investors, Inc.

## MEMORANDUM ON FEES

HAROLD LAVIEN, Chief Judge.

Recently, in this Circuit and particularly in this District, an increased concern has been shown by the Courts in the manner in which professionals detail the time for which they seek compensation. Bankruptcy Rule 2016 provides only the most general guidance in simply requiring a "detailed statement of services rendered, time expended."

As the cases become more complicated, both with the increasingly more complicated issues and the frequency and persistence of the opposition, and the increased procedural and constitutional requirements, applications seeking compensation contain an ever increasing number of hours. That would be cause for concern by itself, but the problem is exacerbated in bankruptcy by, first, the change in standards in the 1978 Act found in 11 U.S.C. § 330. These changes overruled such cases as *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1977), and *Mass. Mutual Life Insurance Co. v. Brock*, 405 F.2d 429, 432 (5th Cir.1968), by doing away with the notion that bankruptcy fees should be based on conservation of the estate and economy of administration and should be at the lower end of the prevailing spectrum. Instead, it is now the Congressional mandate that fees should be "based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title." Of course, the rationale for the

change was that, otherwise, the best talent would flee the field. Second, this change in philosophy has been accompanied with a very significant rise in the prevailing hourly rates in the legal field over the last two decades. In the case of *New York Ass'n for Retarded Children v. Carey*, 711 F.2d 1136 (2d Cir.1983), a chart appears showing that for the Wall Street firm of Cravath, Swaine & Moore, the range of billing rates based on one to eight years of experience went, in 1972, from $26 to $40 to a range in 1980 of $65 to $105. In the period from 1980 to the beginning of 1986, even those of us outside of New York are aware that it is not uncommon to find that the 1980 rates have now at least, doubled. The cause for this increase and, particularly, the escalation within the last half dozen years has its roots in a combination of factors including inflation, the need to keep up with competition resulting in high rent office space in new buildings, all types of state of the art electronic equipment, greater specialization which requires tremendously expanded staffs and which, in turn, leads to intense competition for the top law school graduates whose starting salaries now range, on Wall Street, in the $40,000 to $50,000 category and though lower elsewhere, are still correspondingly high. The net result of all of this is that any extensive use of legal talent may well mean the difference between a distribution to unsecured creditors and no such distribution.

All of this requires, therefore, a most careful scrutiny of fee applications by the Court at a time when budgetary constraints limit staff and the Courts face an ever increasing litigous society so that, not only do bankruptcy cases maintain a high level, but the disputes in each case multiply and, of course, we are now coming back to the added time-consuming disputes over jurisdiction. In this District, the United States Trustee, apparently, has his own priorities and problems and is not always able to render specific analysis of fee applications. And, of course, I have previously noted the failure of counsel for creditor's committees, debtor, or the trustee, to recognize fee analysis as an important and integral part of their function. *See*, Lavien, *Fees as Seen from the Bankruptcy Bench*, 89 Commercial Law Journal. 3, 136–138 (1984).

All of this has forced this Court, along with others, including the First Circuit Court of Appeals, to reorganize the manner in which fee applications should be submitted. Computer printouts used by many firms are next to worthless to the Court, generally and specifically, in attempting to determine how much time was actually used on any one particular task. Lumping a day's activities in one entry may be an honest and complete summary but is of absolutely no value for any analytical purpose. For the strong stand that other jurisdictions and Courts have taken as to this process of lumping, *see*, *Cohen & Thiros v. Keen Enterprises*, 44 B.R. 570 (Bankr.D.N. D.Ind.1984); *In re Holthoff*, 55 B.R. 36 (Bankr.E.D.Ark.1985), "Counsel should not group all tasks performed in one day into a single billing. Each type of service should be listed with the corresponding specific time allotment." The First Circuit has minced no words in its insistence that time records not only be kept contemporaneous with the event, but that the time spent be so described as to enable the Court to make evaluations as to the reasonableness of time spent on each task without itself becoming immersed in a Serbonian bog. *In re Grendel's Den, Inc.*, 749 F.2d 945 (1st Cir.1984).

As long ago as *Souza v. Southworth* 564 F.2d 609, 612 (1st Cir.1977), we warned that a failure to document time "might merit disallowal, or at least drastic reduction, of a fee award". We recently strengthened that admonition in *Wojtkowski v. Cade*, 725 F.2d [127] at 130 [1st Cir.1984], by advising attorneys to "maintain detailed, contemporaneous time records". Other courts have taken the additional step of *requiring* such contemporaneous time records. *See, e.g., Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983) (prospectively requiring the filing of contemporaneous time records); *New York Ass'n for Retarded Children*

*v. Carey,* 711 F.2d 1136, 1148 (2d Cir. 1983) (taking identical action); *National Ass'n of Concerned Veterans v. Secretary of Defense,* 675 F.2d 1319, 1327 (D.C.Cir.1982).

We now take the same step and serve notice that henceforth, in cases involving fee applications for services rendered after the date of this opinion, the absence of detailed contemporaneous time records, except in extraordinary circumstances, will call for a substantial reduction in any award or, in egregious cases, disallowance. In the instant case, we feel it would be unfair to apply this standard, but subject the retrospectively created record of time to a more exacting scrutiny than we would bring to contemporaneous and detailed records.

Lest there be any question as to what is meant by detailed contemporaneous time records, a quote from *Ramos v. Lamm,* 713 F.2d 546, 553 (10th Cir.1983) should make it clear as to exactly what the First Circuit had in mind.

The first step in calculating fee awards is to determine the number of hours reasonably spent by counsel for the party seeking fees. In the future, district judges in this Circuit will inform lawyers that if they intend to seek attorney's fees under § 1988 they must keep meticulous, contemporaneous time records to present to the court upon request. These records must reveal, for each lawyer for whom fees are sought, all hours for which compensation is requested and how those hours were allotted to specific tasks—for example, how many hours were spent researching, how many interviewing the client, how many drafting the complaint, and so on.

On February 1, 1986, this Court's Local Bankruptcy Rules became effective and attempt to deal with the need for specific information. *See* Rule 32, entitled, "Application for Compensation".

(A) Professional persons employed in a case may seek compensation for services and reimbursement of expenses through an interim or final fee application. The "detailed statement" supporting such an application required by R2016(a) of the Bankruptcy Rules shall, at a minimum, contain the date each task was performed, the name of the individual performing such task and a description of the nature and subject matter of, and time expended for each task. The application shall also set out the hourly rate for each professional, associate or assistant, and shall total the number of hours expended by each professional, associate or assistant.

The Court is aware that although the judges in the district have, periodically, complained about fee applications, it has been the long-standing practice to accept them in the form that included a grouping of daily entries and have made rough estimates weighing the doubts against the claimants. For a further discussion of grouping, *see, In re Jensen Farley Pictures, Inc.,* 47 B.R. 557, 582 (Bankr.C.D. Utah 1985). It is also aware that its new rules only became effective February 1, and that there is considerable uncertainty as to how to comply. This is particularly true, concerning applications that have already been prepared or time sheets that have already been prepared under the old practices. The Court also recognizes that even with the grouping, applications contain 40 to 100 pages of computer or summary of times, and counsel now claims to spend considerable time assembling the material even in its present form.[1]

The ultimate resolution of this problem, that is, how to handle and keep records so that they will provide the Court with the specific detail it needs and, at the same time, not add to the already extensive overhead by requiring a whole new ac-

---

1. A claim as to the amount of time involved in assembling the fee applications containing the groupings really raises some questions of the validity of whether or not those time sheets were prepared contemporaneously, because if they were, the argument of time seems to be self-defeating since all that would be required is a mechanical assembling of the computer or time sheets that had been contemporaneously prepared.

counting and technical writing staff, will have to be made with some reasonable accommodation between Court and counsel. But, at the very least, every fee application must have a specific analysis of each task for which compensation is sought. In fact, instead of arranging the computer sheets by days, time records might better be kept by function or task and, with computers, that should not present such a great problem. For example, a recovery of a preference would be an appropriate sub-heading under which would be listed who did what and when and for how long, what was sought, what was recovered, with any explanatory remarks or, if nothing was recovered, why the estate nonetheless should bear the expense. Then, without nit picking or major effort or guestimates, in trying to piece together the facts, the Court and anyone else interested could make a rational evaluation of the reasonableness of the services rendered and their necessity.

Counsel has pointed to such routine items as the numerous telephone calls in a case, as presenting a unique difficulty in itemizing each and every call separately, but that need not be so. The telephone calls dealing with the preference action would be so listed with a word or two as to their subject—more, if it was an extended call. General calls are the exact problem and would be clearly identified so that whether they were, for example, trustee's business or counsel work, could more readily be determined. Likewise, items that might be both trustee's work and counsel's work, particularly when the same person or firm is both, should be explained and apportioned. For example, a trustee's report might well properly attribute the number of hours to preparing and assembling from information that the trustee should have in his own files and that should, of course, not be billable as legal time. But, in the course of the report, there may be a need for an attorney, assuming that they were not the same person, to examine Court dockets or his legal files for matters he would normally be expected to have previously communicated to the trustee in the course of keeping him abreast of developments within the

various cases. If counsel has not already done so, (the question of whether he had done so or not would be somewhat moot, if they were the same person), a reasonable billing for that explanatory material by counsel would well be reasonable. However, it should be billed only once and there should be an apportionment between that which would have to be communicated by the attorney and that which would be material that the trustee would already become aware of, or that would be in the trustee's files, if counsel and the trustee were two different people. In any event, with a rational allocation and an explanation, the Court could make a reasonable judgment.

■ With all of this in mind, we come to the fee application of John Cullen, counsel for the trustee, who is seeking $59,008.25 and has previously been allowed an interim fee of $9,174.69 for, approximately, two years of work in this matter. It, first of all, should be clear that Mr. Cullen is not seeking compensation at this time for his services as trustee, nor is he seeking reimbursement for disbursements. In the context of the previous practice of this Court, Mr. Cullen's presentation is considerably more specific and detailed than most that have been dealt with by the Court over the past several years. Nonetheless, it fails to meet the appropriate standards and he is, therefore, directed to submit a supplemental application, recognizing that because of previously accepted practices, his record-keeping might not have been so organized as to readily allow a breaking down of the various tasks and allocating hours and personnel. If this were a new application, a greater degree of itemization would be expected but for present purposes, counsel may list as categories appeals to the district court and appeals to the Court of Appeals, and may then aggregate hours spent in those categories but, giving as a minimum the number of proceedings, motions, briefs and such, that were filed. Likewise, accounts receivable would seem to fall into another category in which time spent, who spent it, the number of suits, settlements and recoveries should be listed.

These two categories are given by way of illustration and are not intended to be exclusive, nor is it the Court's intention to exclude the possibility of a reasonable request for compensation caused by this required additional itemization. At the same time, however, it should be recognized that much of this detail should have been provided in the first place, even though the application complies with what had been the accepted practice.

Jon D. Schneider, counsel for the former trustee, has submitted a final report for compensation in the amount of $250,000 of which he has already received, on August 3, 1983, $75,000 as interim compensation. His firm, Goodwin, Procter & Hoar, is also seeking expenses in the amount of $13,-662.34. That application has been scheduled for hearing on March 24, 1986 at 9:00 A.M. Counsel will be expected to comply with Local Bankruptcy Rule 32, as its purposes have been outlined in this Memorandum. If that requires a supplement to the previously submitted fee applications, counsel will be responsible to see that it is prepared and submitted to anyone to whom as part of the notice of hearing, a copy of the full fee application was provided. If counsel feels it is necessary to file such a supplement but cannot have it prepared and distributed in time to give 20 days notice of the hearing, then counsel will notify the Court no later than March 3, 1986, so that notice of a continuance of the hearing date may be given and a new hearing date set.

Pierson, Ball and Dowd, as special counsel for the trustee, has submitted a bill for $116,580 and $10,409.87 in expenses, of which $25,000 was previously allowed as interim compensation. That application has been scheduled for hearing on March 31, 1986 at 10:00 A.M. Counsel will be expected to comply with Local Bankruptcy Rule 32, as its purposes have been outlined in this Memorandum. If that requires a supplement to the previously submitted fee applications, counsel will be responsible to see that it is prepared and submitted to anyone to whom as part of the notice of hearing, a copy of the full fee application was provided. If counsel feels it is necessary to file such a supplement but cannot have it prepared and distributed in time to give 20 days notice of the hearing, then counsel will notify the Court no later than March 10, 1986, so that notice of a continuance of the hearing date may be given and a new hearing date set.

## MEMORANDUM ON INTERIM FEE FOR JOHN F. CULLEN, ATTORNEY FOR TRUSTEE

This case originated in the Southern District of New York as a voluntary Chapter 11 on August 15, 1980. As a result of a hearing in the Bankruptcy Court in New York, this case was transferred to Massachusetts. On September 8, 1980, a trustee was authorized and was appointed by the United States Trustee. That trustee operated the radio station, determined that reorganization was not feasible, and sold the station. Years later, and 27 pages of docket entries later, that trustee resigned, having taken the case through confirmation of a liquidating plan. It was now necessary to appoint a successor trustee to handle distribution, deal with claims, the existing and steady flow of motions, a great variety of pleadings and appeals filed primarily by Mr. Anthony R. Martin-Trigona.

Because, by this time Mr. Anthony R. Martin-Trigona's reputation for litigation has become well known,[1] it was with some difficulty that the United States Trustee

1. His reputation, not only of a litigious nature but for engaging in intimidating tactics on related personnel has been recognized in legal circles well beyond our local area.
   Illinois: *In re Martin-Trigona*, 55 Ill.2d 301, 302 N.E.2d 68, 72 (1973); *Martin-Trigona v. Gouletas*, 634 F.2d 354, 362 (7th Cir.1980); S. Dakota: *In re Krisle*, 54 B.R. 330, 13 B.C.D. 780, 791 (Bankr.S.Dakota, 1985);
   New York: *Martin-Trigona v. Brooks & Holtzman*, 551 F.Supp. 1378, 1384 (S.D.N.Y.1982); Connecticut: *In re Anthony R. Martin-Trigona*, 573 F.Supp. 1245 n. 7 (D.Conn.1983); Washington, D.C.: *Anthony R. Martin-Trigona v. U.S.*, 779 F.2d 72 (D.C.Cir.1985)

was able to find anyone willing to assume the task. By this time, the previous trustee and his counsel, as well as his entire firm, as well as many of the judges had been sued in the second circuit. The new trustee was soon met with a barrage of pleadings and required counsel. He was not readily able to find anyone willing to assume the position and so, was authorized to serve as his own counsel.

Counsel has submitted interim fee applications on August 24, 1984 and was allowed an interim fee of $9,174.69 on October 3, 1984, and no additional compensation to this time. His current request for the period June 20, 1984 through December 17, 1985 is for $59,008.25. No request is currently being made for expenses or trustee's commission. Notice was sent to all creditors and Anthony R. Martin-Trigona. Two objections were received, one from Edward R. Suskin, representing at least one creditor, and one from Anthony R. Martin-Trigona.

Counsel for the trustee's applications were fairly extensive in outlining the work done by their firm. Unfortunately, in keeping with the form of such applications in this district, they did not readily allocate specific time to specific tasks, this was the subject of both objections.

At the hearing on the interim fee, Mr. Anthony R. Martin-Trigona and the United States Trustee appeared, the former to object, the latter to support the fee request. The trustee and the U.S. Trustee made oral presentations in support of the application. Mr. Martin-Trigona sought to question both the Assistant U.S. Trustee and counsel for trustee. The Court advised Mr. Martin-Trigona that he had no standing—this had been the determination of this Court, *In re WHET, Inc.*, Memorandum on Standing of Anthony R. Martin-Trigona, 33 B.R. 438 (Bankr.D.Mass.1983), supported on appeal by the District Court and the Court of Appeals. Further, he signed his objections as a representative of the debtor corporation; however, in this Circuit, a corporation can only be represented by an attorney. *Anthony R. Martin-Trigona and WHET,*

*Inc. v. David J. Ferrari,* 750 F.2d 149 (1st Cir.1984). The matter before us is not only an interim fee application but further in this case, the Court had ample opportunity to observe counsel and judge the quality of his services and the same, I'm sure, is true of both the District Court and the Court of Appeals. For all of these reasons, Mr. Martin-Trigona was not allowed to interrogate either the United States Trustee or counsel, but the Court did extend to him the courtesy as a friend of the Court to make an oral presentation, which he proceeded to do so. At 12:45 P.M., after approximately an hour with the comments becoming repetitive, the Court told him he would have until 1:00 P.M. to complete his presentation. He terminated his presentation a few minutes after 1:00 P.M. The gist of both the written and oral objections were that time was not broken down as to specific tasks, trustee work was billed as attorney time, excessive time was billed, too much time was spent on receivables for the results achieved and not enough time was spent achieving better results, too much time was spent on appeals, various criticisms of things done or not done as trustee. It should be noted that there is no application for payment of trustee. Those items will be considered at the appropriate time.

The Court issued a memorandum to counsel for the trustee and used it as an opportunity to point out the new Local Rule, effective February 1, 1986, now no longer accepting the old method of listing time by day, rather by task. Counsel has, in accordance with that memorandum, filed a supplement to his fee application, breaking down his time as in specific categories of tasks.

Before considering the hours and rates charged by counsel, the so-called lodestar, a few general observations.

Both objectors complain that this trustee came into the case with the assets already liquidated so that all he had to do was distribute the funds and close the case, yet he has been at it for two years with an unascertained future before the case is

closed and all the time building a legal fee without any substantial benefit to the estate. It is really hard to imagine a more graphic example of Orwellian double-think. The avalanche of pleadings and appeals were not initiated by the counsel for the trustee but, rather, by the objector's activities to which the trustee, through counsel, was required to respond. Even the 50% dividend that the trustee paid was cause for objections and appeals. It is true that this case has been overly prolonged and should have been closed years ago without the need of most of these legal fees but that is not the fault of counsel for the trustee. It is unfortunate for all concerned that the forecasts of this Court, *In re WHET, Inc.,* 33 B.R. 424, 434 (Bankr.D. MA.1983) repeated in Footnote 3 in *U.S.A. v. Anthony R. Martin-Trigona,* 759 F.2d 1017 (2d Cir.1985) and, most recently, *In re Krisle,* 54 B.R. 330, 13 B.C.D. 780, 791 (Bankr.S.Dakota 1985), have proven true.

> The result is that the accusations increase, the motions, pleadings, complaints and suits multiply, courts and lawyers are buried in mountains of time-consuming paper. If there is one truth, it is that the estate will be bled white by the costs and legal fees engendered by his 'crusade.'

As has been pointed out *In re Thomas, Inc.,* 43 B.R. 510, 512 (Bankr.D.Mass.1984):

> ('Obviously, the more stubborn the opposition the more time would be required'); *Perkins v. New Orleans Athletic Club,* 429 F.Supp. 661, 667 (E.D.La.1976) ('Those who elect a militant defense ... [are responsible for] the time and effort they exact from their opponents.').

> The lodestar we observe was first developed for use by a court faced with the task of determining, for services already rendered, a fair attorney's fee for parties who never retained—and therefore never negotiated a fee agreement with—the attorneys who now seek payment from them. *B & M v. Sheehan, Phinney, Bass & Green,* 778 F.2d 890 (1st Cir. 1985).

In determining the fee, the Court should not be

"... influenced by the notion of strict economy, a concept prevalent under the Bankruptcy Act of 1898 (the "Act"), which was in effect at the time of *B & M's* filing of bankruptcy. Under this principle, attorneys are 'not expect[ed] to be compensated as generously for their services as they might be [if] privately employed.' *In re First Colonial,* 544 F.2d [1291] at 1299 [5th Cir.1977]. *See also In re J.M. Wells, Inc.,* 575 F.2d 329, 331 (1st Cir.1978); 2 Collier on Bankruptcy ¶ 330.05[2][e] (15th ed. 1985). Even, however, under this notion of frugality, courts have recognized the importance of awarding fees that are economical, not 'parsimonious,' and liberal enough to attract competent counsel to bankruptcy work. *In re First Colonial,* 544 F.2d at 1299. And the fee arranged here *was* lower than the 50% fee prevailing in the private market. Moreover, the principle of strict economy has been abandoned for reorganizations entered into after passage of the Bankruptcy Reform Act of 1978 (the 'Code'). Under the Code, attorneys are entitled to fees 'based on the time, the nature, the extent, and the value of such services *and the cost of comparable services other than in a case under [the Bankruptcy Code],'* 11 U.S.C. § 330(a)(1) (emphasis added). *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 329–30, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6286; 124 Cong. Rec. H 11,089 (1978) (statement of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Ad.News 6436, 6442. In light of this change, many of the subsequent cases considering fee petitions still governed under the old Act have tried to balance a spirit of economy on the one hand with fees sufficiently close to market rates to attract qualified counsel on the other. *See Rose Pass Mines, Inc. v. Howard,* 615 F.2d 1088, 1092 & n. 10 (5th Cir.1980); *In re Continental Investment Corp.,* 28 B.R. 972, 979 (D.Mass.1982); *In re Pacific Far East Line, Inc.,* 458 F.Supp. 771, 775–76 (N.D.Calif.1978),

*aff'd in part and re'd on other grounds,* 654 F.2d 664 (9th Cir.1981); *In re Citizens Mortgage Investment Trust,* 37 B.R. 813, 820 (Bankr.D.Mass.1984). While we acknowledge that economy remains a valid consideration in this case, we also believe that true economy necessarily requires attention to the market rate."

*B & M v. Sheehan, supra,* 897.

The procedure for computing the lodestar is spelled out by the First Circuit in *B & M Corp. v. Moore,* 776 F.2d, 6 and 7 (1st Cir.1985).

Under the methodology pioneered by the Third Circuit in *Lindy Brothers Builders, Inc. v. American Radiator & Sanitary Corp.,* 487 F.2d 161 (3rd Cir.1973) ("Lindy I"), and adopted by this circuit in *Furtado v. Bishop,* 635 F.2d 915, 919–20 (1st Cir.1980), the fee-setting court first establishes a "threshold point of reference" or "lodestar", which is the number of hours reasonably spent by each attorney multiplied by his reasonable hourly rate. *See, e.g., Grendel's Den, Inc. v. Larkin,* 749 F.2d 945, 950 (1st Cir.1984). This lodestar can then be adjusted up or down to reflect a variety of factors, such as delay in payment, quality of representation, and the results obtained, if they have not already been taken into account in computing the lodestar. *See, e.g., Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984); *Miles v. Sampson,* 675 F.2d 5, 8 (1st Cir.1982); *Furtado,* 635 F.2d at 920.

To determine the number of hours 'reasonably' spent, as well as in setting a 'reasonable' hourly rate, a court must review the work to see whether 'counsel substantially exceeded the bounds of reasonable effort,' *Pilkington v. Bevilacqua,* 632 F.2d 922, 925 (1st Cir.1980), and should disallow hours that were 'duplicative, unproductive, excessive, or otherwise unnecessary.' *Grendel's,* 749 F.2d at 950. *See also Hensley,* 461 U.S. at 434, 103 S.Ct. at 1939–40; *Wojtkowski v. Cade,* 725 F.2d 127, 130 (1st Cir.1984). In setting the lodestar, a court is also expected to consider a variety of factors, including the 'type of work performed, who performed it, the expertise that it required, and when it was undertaken.' *Grendel's,* 749 F.2d at 951; *see also Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 1548–50, 79 L.Ed.2d 891 (1984); *In re Casco,* 25 B.R. at 755.

■ Included with the criteria is the undesirability of the case and the opposition encountered. *In re Casco Bay Lines, Inc.,* 25 B.R. 747 (Bankr.App.Mass.1982). For the most recent characterization of the opposition encountered, *see In re Anthony R. Martin-Trigona v. Belford, Trustee, et al,* 781 F.2d 36 (2d Cir. Jan 13, 1986).

Consideration should also be given to specialized counsels' understandable expectations that their bills, if reasonable, will not be unduly parsed and to the adequacy of fees necessary in attracting the most competent counsel, particularly when the legal work was of a kind that could arise as well in a nonbankruptcy context. *See Boston & Maine v. Sheehan,* at [897–898]; *Boston & Maine Corp. v. Moore, supra* at 7.

In this interlocutory fee application, under 11 U.S.C. § 331, the following is being requested:

## SUMMARY OF SERVICES

June 20, 1984 through December 17, 1985

| Attorney | Yrs. as Atty | Yrs. Bkcy Pract | Total Billable Hours | Rate | Total Value of Services Rendered |
|---|---|---|---|---|---|
| John F. Cullen | 10 | 6 | 102.00 | $100.00 | $10,200.00 |
| Robert O. Resnick | 5 | 5 | 6.25 | 80.00 | 500.00 |
| Elyse A. Brill | 3 | 3 | 304.75 | 70. to 85.00 | 23,844.50 |
| Carole Neville | 1 | 1 | 220.75 | 85.00 | 18,763.75 |

| Legal Assistants | Total Billable Hours | Rate | Total Value of Services Rendered |
|---|---|---|---|
| Laurel Friscia | 24.75 | $35.00 | $ 866.25 |
| Carole Neville | 125.25 | 35.00 | 4,383.75 |
| Edward O'Brien | 18.00 | 25.00 | 450.00 |
| | | Total Legal Services | $59,008.25 |

██ The time is broken down into work on seven (7) briefs to the district court and 10 briefs to the Court of Appeals, covering multiple issues, including the constitutionality of the Bankruptcy Amendments, many aspects of appellate procedure not yet settled in this Circuit, the standing of the Appellant in a variety of poses (guarantor, corporate wage earner, shareholder, creditor, attorney for the debtor, president of a post-confirmation, reorganized corporation), the standing of the trustee after confirmation of plan, employment of professionals, reconsideration of claims against the estate, and other issues involving interpretations of Bankruptcy Code sections.

In addition, over 20 motions or memorandums were filed in the district court and Court of Appeals in connection with these appeals. Thus far, the trustee has prevailed on all of the substantive issues. His itemized charges for this constitutes a mere 51.25 hours of his time and the utilization of 383.50 hours of associates' time and 146 hours of clerks' or paralegals' time, totaling $41,395.

There were 28 documents of one type or another filed in the bankruptcy court in addition to the hearings required for which Mr. Cullen claims 39.5 hours, and his associates, 86 hours, totaling 10,023.75. The receivable went back several years and not only had to be reviewed by the trustee, but each involved questions of proof requiring counsel's participation. It is noted that Mr. Anthony R. Martin-Trigona insisted that the accounts be pursued. The activity of the prior trustee and counsel had to be reviewed since they had spent time with some of the receivables, having settled some, lost some and collected some. The present counsel's activity resulted in $10,000 in judgments as yet uncollected. For these activities, counsel is seeking $7,533.75, made up of 11.25 hours of his time, 72.25 hours of associates and 21.75 hours of a paralegal clerk. The total of the Appellate Court, bankruptcy court, and receivable actually totaled $58,952.50.[2]

██ First, considering the hours, the determined opposition, the almost automatic appeal of every order of the bankruptcy court, and the combined cleverness of Mr. Martin-Trigona who, often, was able to find a broken or bent twig that he attempted to parley into a diseased tree along with his ability to rationalize adverse facts into their antithesis made this expenditure of time reasonable. Two areas merit special comment. The receivables have not yet added anything of substance to the estate and, arguably, some of the review and analysis might be considered trustee's work. In light of the history of this case, it was not unreasonable for counsel to examine the potential receivables and attempt to pursue them. The amount expended seems a prudent compromise in limiting his involvement as counsel with investigation and such action as was and will be taken to be reasonably satisfied as to their potential

2. Note, the amount in the original interim fee request was $59,008.25, or a difference of $55.75 which is unexplained and, therefore, the Court will deal with the lower figure.

benefit to the estate. The same is true as to the attorney involvement in trustee reports and, although we do not have as exact a breakdown as we would like and will expect in the future under Local Bankruptcy Rule 27 which became effective February 1, 1986, it is fairly clear that the time spent as counsel was minimal and even if trustee and counsel were different parties, counsel would need to spend some time bringing the trustee up to date on all of the appeals, court actions, and other legal matters needed to enable the trustee to file his report.

> While it is easy to speculate in hindsight that counsel might have succeeded with a less thorough presentation, it is also possible that they would have failed, leaving the railroad without the important benefit of reduced labor costs.
>
> ... There is a point beyond which it is neither possible nor profitable to assess the quality of a counsel's time.

*B & M Corp. v. Moore, supra,* p. 8.

Because I believe that the kind of analysis envisioned by Mr. Anthony R. Martin-Trigona would have been counter-productive in these circumstances and, because the hours at issue were sufficiently explained, they are allowed.

█ As to the hourly rates, with one exception, they are modest and the lower end of rates being charged by comparably skilled counsel both in bankruptcy and in non-bankruptcy similar matters in the Boston area, with one exception. *See In re Bishop,* 32 B.R. 302, 10 B.C.D. 1230 (Bankr.R.I.1983). In relating Providence legal rates to Boston, our Circuit Court stated, "We are somewhat surprised that the court equated the City of Providence with Boston, a city with an unenviable reputation for high costs." *Lamphere v. Brown University,* 610 F.2d 46 (1st Cir. 1979). Carole Neville became a member of the bar during the relevant period and went from $35.00 per hour, paralegal, to $85.00 per hour, attorney—a higher rate then one associate of five (5) years experience who was billing at $80.00 per hour, and another associate who, with three (3)

years experience, went from $70.00 to $85.00 per hour. In the 1984 to 1985 period, here involved the reasonable scale for graduate's first year in a small law office would be in the $60.00 to $70.00 range.

> The court, either trial or appellate, is itself an expert on the question (of attorney's fees) and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of testimony of witnesses as to value. *The matter of TMT Trailer Ferry, Inc.,* 577 F.2d 1296 (5th Cir.1978); *Mesapetroleum Co. v. Coniglio,* 629 F.2d 1022, 1030 (5th Cir. 1980); *see also, Woftkowski v. Cade,* 725 F.2d 127 (1st Cir.1984).

This seems borne out by the rates paid to others in this firm. Ms. Neville has a background of student clerkship for Abraham D. Sofaer while he was a district court judge in the Southern District of New York, so that I would place her at the upper end of the scale. Since she has a total of 220.75 hours as an attorney, her fee must be reduced by $15.00 per hour or $3,311.25, making the total allowable interim fee, $55,641.25.

In making this interim allowance, recognizing that they are subject to later adjustment, the Court has not only relied on the written submissions and the oral arguments, the Court has also considered its own knowledge and experience considering the reasonable and proper fees and has formed its own independent judgment based on the material presented and its own familiarity with the case that these interim fees are fully justified on the record before it.