In re WHET, INC., Debtor.

Bankruptcy No. 80-1542-HL.

United States Bankruptcy Court, D. Massachusetts.

June 12, 1986.

772

Jon D. Schneider, Goodwin Proctor & Hoar, Boston, Mass., for Trustee, David J. Ferrari.

John F. Cullen, Cullen & O'Connell, Boston, Mass., Successor Trustee.

Gordon W. Hatheway, Jr., Pierson, Ball & Dowd, Washington, D.C., Special Counsel to Trustee.

## MEMORANDUM ON FEE APPLICATION OF JON D. SCHNEIDER

HAROLD LAVIEN, Chief Judge.

This is the third in a series of three memoranda addressing the fee applications of attorneys employed in the administration of the WHET, Inc. estate. The first memorandum *In re WHET, Inc.*, 58 B.R. 278 (Bankr.D.Mass.1986), outlined new guidelines to be followed in the structuring of fee applications and analyzed the application of the counsel to the present trustee, Mr. John Cullen. The second memorandum, *In re WHET, Inc.*, 61 B.R. 709 (Bankr.Mass.1986) discussed the application of Pierson, Ball & Dowd, special F.C.C. counsel to the estate. Reference will be made to these prior two opinions rather than repeating the analysis already laid out in them.

Under consideration is the fee application of Jon D. Schneider of the firm of Goodwin Procter & Hoar, for compensation as counsel to the trustee. Mr. Schneider is requesting $221,683.90 in fees, $75,000 of which was allotted by the Court as an interim award in August of 1983. In addition, he is requesting $13,622.34 in disbursements for which he has not received any compensation.

As was explained by the Court in its previous opinion, *In re WHET, Inc.*, 59 B.R. at 283, this case was originally commenced on August 15, 1980 in the Bankruptcy Court for the Southern District of New York and after a hearing on the matter in that court, venue was transferred to the District of Massachusetts. On September 19, 1980, Mr. David Ferrari was appointed as trustee by the United States Trustee and, subsequently, on October 17, 1980, applied and received Court authorization to employ Jon D. Schneider of the firm of Goodwin Procter & Hoar as his counsel. Mr. Schneider remained employed as such until Mr. Ferrari's resignation on October 31, 1983. Shortly thereafter, Mr. Cullen was appointed as trustee and received Court authorization to serve as his own counsel; he is presently acting in both capacities.

This fee application presents something more than the usual considerations. Mr. Schneider is an experienced and well thought of bankruptcy expert, and his firm is one of Boston's most prestigious. Nonetheless, a substantial amount of counsel and court time could have been avoided had counsel recognized the need to exercise even more than the usual care to dot all his "i's" and cross all his "t's". It was apparent from the earliest hearings in 1980, that Mr. Martin-Trigona was a remarkably litigious individual with a good legal education who was determined to protect what he perceived to be an interference with his interests—this, notwithstanding his voluntary invocation of the bankruptcy process. Thus, motions, objections, hearings and appeals resulted each time Mr. Schneider allowed the trustee to take some action, or inaction, or file, or fail to file, some document or report that did not comport with each and every detail of a rule. This was the result, even if the variance was of no practical import and was within the spirit of the rule or practice. I fully appreciate that counsel may have felt an intense frustration, but his reaction to it should have been a meticulous attention to detail no matter how put upon he felt. Instead, counsel spent considerable time that cannot properly be billed to the estate explaining, answering, ignoring and then further answering or amending and attending hearings that we all could have avoided. I, of course, do not mean to suggest that had counsel acted differently, this case would have flowed smoothly—merely, that this has been a long and difficult enough journey without the need of counsel causing us to be detoured down additional roads with their ruts and potholes.

Mr. Schneider's fee application dates from August 15, 1980 up until April 4, 1986. Although it is entitled "final fee application", Mr. Schneider has requested permission to apply to the Court for compensation for future services he may render. Before dealing with the specifics of the application, an explanation is in order

for the continuing claim for compensation of Mr. Schneider in this case, almost three years after his resignation as trustee's counsel. This can be attributed to the litigative activities of Mr. Martin-Trigona, the former president of the debtor corporation. Mr. Martin-Trigona has commenced a total of five (5) civil suits, naming Goodwin Procter & Hoar as defendant, as well as others, and of these, four (4) remain pending. The first of these is a case filed in the Southern District of New York on December 8, 1982 by Mr. Martin-Trigona, alleging a bankruptcy ring conspiring in the administration of this estate to deprive the debtor of its assets and civil violations of the racketeer influence corrupt organization statute (RICO). Goodwin Procter & Hoar is only one among several named party-defendants in the case. Although Mr. Ferrari was not originally named in the case, he was, subsequently, at which time Goodwin, Procter & Hoar prepared a motion to dismiss on his behalf as well as on their own. A second civil action was commenced by Mr. Martin-Trigona on April 18, 1983 in the United States District Court for the District of Connecticut. Hearings were held on this matter during June of 1983 resulting in the dismissal of that action. On May 17, 1983, Mr. Martin-Trigona filed three (3) new suits in the Southern District of New York, naming Goodwin Procter & Hoar as one of the party-defendants. All three of these suits are still pending and a motion has been filed by the firm to consolidate these actions with the first suit commenced by Mr. Martin-Trigona still awaiting decision in the Southern District of New York.

■ Goodwin Procter & Hoar seeks and will be allowed compensation from the estate for the firm's pro se representation of itself, attorneys associated with the firm, and defense of Mr. Ferrari. Clearly, Goodwin Procter & Hoar is in a defensive and embarrassing position in these suits, *In re WHET, Inc.*, 61 B.R. 709, 712 (Bankr.D. Mass.1986) and would not be named in them but for their role in this case. As stated by the Court at the hearing on this matter, fees will be awarded to Goodwin Procter & Hoar for their pro se representation of themselves, provided that the firm is not found liable in the suits. In the event Goodwin Procter & Hoar is found liable, then an appropriate remittance of fees will have to be made by the firm.

The case cited by Mr. Martin-Trigona, *Crooker v. United States Dept. of Justice*, 632 F.2d 916 (1st Cir.1980), as authority for his assertion that Mr. Schneider's firm should be denied compensation for its pro se defense is readily distinguishable. *Crooker*, deals with a non-lawyer pursuing a suit against the United States Government under the specific statutory structure of the Freedom of Information Act. The court discusses at great length the nearly impossible task of calculating the amount of a fee award to a non-lawyer and states that such compensation would provide the non-lawyer with a windfall. The facts of the matter under consideration are inapposite, Goodwin Procter & Hoar, and some of its attorneys have been sued, not initiated suit as in *Crocker*, merely because of their involvement as Court-approved functionaries necessary for the required administration of this estate.

■ Cases in the Freedom of Information Act field or Civil Rights field denying pro se attorney's fees are readily distinguishable from the case under consideration, not only because of a specific and different statutory scheme but, because of the essential difference in the position of the litigants. Functionaries in bankruptcy, without whom the system cannot be administered, cannot be placed in a position of intimidation by not only being sued for their role in estate administration, but by being subject to attorney's fees. This is true, of course, unless the attorneys have maladministered. A judgment which, in the first instance, should be rendered by the Court which appointed them, in this case, the bankruptcy court, where ample sanctions exist. In this court remedies range from fee reduction or even elimination, to sanctions, disbarment and reference to the United States Attorney. On the other hand, when the functionary has

properly administered the estate, legal fees are, and should be, a proper charge on the estate that is being administered. If the attacked functionary believes that his own firm can provide him with the best defense, and is the preferable counsel, that should be his choice so long as any fee request is subject to Court scrutiny and approval. The expenses for a legal defense of the proper administration of the estate are, in fact, no different than any other expense the functionary is required to incur in the performance of his duty.

■ Counsel claims to have expended 841.95 hours of attorneys' time and seeks $54,137.75 for legal services charged for their self-defense in the five (5) law suits commenced by Mr. Martin-Trigona, naming the trustee, the firm, and some of its attorneys as party-defendants. To be considered in evaluating the value of the services is the seriousness of the charges against the trustee, counsel, and the law firm. The outcome of the suits would, by the very nature of the charges, have a potentially devastating affect on the reputation of the firm and its attorneys, as well as the financial loss of any monetary judgment. In evaluating the fees, the Court notes that counsel has been forced to appear in distant forums. Although, all of these cases deal with the administration of an estate in Boston, Massachusetts, none of these suits are brought within the First Circuit. Finally, the claims involve the RICO Statute with its rapidly evolving judicial interpretations that require considerable study and concern of counsel. In light of all these concerns, the time spent by counsel was both reasonable and necessary.

As to the period, August 15, 1980 to October 31, 1983, during which Mr. Schneider claims compensation for services, as the trustee's attorney, apart from these examples of direct actions commenced by Mr. Martin-Trigona against the firm of Goodwin Procter & Hoar, there are numerous other instances of Mr. Martin-Trigona's activities causing a tremendous increase in work to counsel and cost to the estate. This Court has previously described Mr. Martin-Trigona's modus operandi in its opinion on the present counsel to the trustee's fee application, *In re WHET, Inc.*, 58 B.R. at 287:

First, considering the hours, the determined opposition, the almost automatic appeal of every order of the bankruptcy court, and the combined cleverness of Mr. Martin-Trigona who, often, was able to find a broken or bent twig that he attempted to parley into a diseased tree along with his ability to rationalize adverse facts into their antithesis made this expenditure of time reasonable.

Also, *see In re WHET, Inc.*, 61 B.R. 709 (Bankr.Mass., 1986) and cases cited therein. There is no question, but that Mr. Martin-Trigona's activities have caused a tremendous increase in expense to the estate. Yet, Mr. Martin-Trigona in a pleading, labeled "Response and Objection to Latest Filings by Mr. Schneider and Motion to Deny Entire Fee Application by Goodwin Procter & Hoar," entreats the Court to deny Mr. Schneider's fee application in its totality. Without doubt, there are billings in Mr. Schneider's fee application that are either inappropriate, unjustified, or not adequately explained, and the Court will address these areas. On the other hand, the estate initially seemed relatively simple to administer and eventually grew into a mass of complications, many due to the efforts of Mr. Martin-Trigona. As stated by the Court in *In re Stolkin*, 472 F.2d 222, 229 (7th Cir.1973).

"To the extent that [the debtor's] own behavior may have contributed to increased fees and expenses in arrangement proceeding he could not be heard to complain. The Chapter XI arrangement is not to be undertaken as a sport and the debtor has responsibility which if fulfilled makes the completion of the arrangement significantly easier. That was not always the case herein."

Originally, Mr. Schneider submitted a fee application on February 4, 1986 for a hearing scheduled for March 24, 1986. Pursuant to a Memorandum issued by the Court

*In re WHET, Inc.,* 58 B.R. at 283, and the recently operative Local Bankruptcy Rule 32, Mr. Schneider was instructed to submit an amended fee application to comply with the newly set court requirements. A new hearing was scheduled for March 31, 1986 at 10:00 A.M., and then, in order to accommodate Mr. Martin-Trigona, rescheduled by the Court to April 1, at 10:00 A.M. The Court made every effort to accommodate all interested parties in its scheduling of the matter as explained in *In re WHET, Inc.,* 61 B.R. 709, 713 (Bankr.Mass., April 8, 1986). At the time of hearing, an oral presentation was made by Mr. Schneider. Objections were raised by Mr. Cullen, the present trustee. Mr. Cullen simply stated that he thought the fee requested should not be granted in full because of a duplication of efforts between trustee and Goodwin Procter & Hoar. However, he was unable to offer the Court specific examples of this duplication or the amount that should be deducted from the requested fee. The United States Trustee submitted a statement of no objection. Mr. Martin-Trigona appeared as President of WHET, Inc.; this Circuit has consistently held that a corporation can only be represented by counsel. This has been repeatedly made clear to Mr. Martin-Trigona. Further, because of his pending individual bankruptcy in Connecticut, this Circuit has already determined that he has no standing. Mr. Martin-Trigona is not a party in interest and was not allowed to cross-examine Mr. Schneider. However, as a courtesy and for such assistance to the Court as he might be able to offer, Mr. Martin-Trigona was allowed to make an oral presentation in opposition to the fee, which lasted two-and-one-half hours. *See, In re WHET, Inc.,* 58 B.R. at 284; *In re WHET, Inc.,* 61 B.R. 709, 713 (Bankr.Mass., 1986).

■ Mr. Schneider's fee application is a rather voluminous pleading, measuring approximately four inches thick and including six different exhibits. Included in these exhibits are the following: A final fee application dated July 1, 1983 through January 31, 1986 which includes a narrative and computer print-out, a supplement to the first interim application dated August 1, 1982 through June 30, 1983 which includes a narrative and computer print-out, a first interim application dated September 18, 1980 through July 24, 1983 which includes a narrative and computer print-out, a time summary broken down into 28 different tasks, and a computer print-out coded to each of the 28 enumerated tasks. Although Mr. Schneider has attempted to comply with the Court's requirements for fee applications, and his efforts are evident in the amended application, there are deficiencies in the application which make it very difficult for the Court to fully analyze and consider his application. Nonetheless, the Court recognizes that the fee application comports with prior accepted practice and covers a time period years before the stricter rules on specific time allocations became applicable. Therefore, in recognition of Mr. Schneider's efforts to comply with the more detailed requirements, the Court will attempt to analyze the application.

■ Some of these deficiencies have been rectified since the date of hearing. For example, in keeping with his firm's policy, Mr. Schneider billed the estate for services rendered 1980–1986 at the present hourly rate. On April 7, 1986, Mr. Schneider filed a "Recalculation of Hourly Time Charges" which presented the hourly rate operative at the time the original services were rendered. As Mr. Schneider explained, the reason for the billing at the 1986 hourly rate for the entire application was compensation to the firm for loss of use of the fee funds during the pendency of this case. This Court had been unable to find any precedent for awarding this type of interest adjustment for the period between services being rendered and the award of an application. While the court in *B & M Corp. v. Moore,* 776 F.2d 2, 7 (1st Cir.1985) cited delay in payment as cause for an upward adjustment in lodestar, the method suggested by counsel would be excessive. The Court understands the financial burden placed on Goodwin Procter & Hoar by this case, which has extended over

a six-year period and required an enormous amount of attention. The firm received an interim fee of $75,000.00 on August 3, 1983, an amount insufficient to compensate Goodwin Procter & Hoar for the attorneys' time spent and the costs it incurred over a six-year period from its involvement in this case. Bankruptcy firms should not be placed in a position of financing the estate. The Court has been unable to find any authority setting out the method to be used in calculating such an increase. In light of this, and recognizing that such an increase is, in many respects, more of a token than an equivalent compensation, the finally allotted fee award, in excess of the $75,000.00 interim allowance, will be increased by ten (10) percent.

■ There are 21 attorneys and five paralegals at Goodwin Procter & Hoar, who have worked on this case from the time of the firm's first involvement to January 31, 1986. There are 2108.5 hours of attorneys' work billed at a cost of approximately $216,917 and at an average hourly rate of $103 (this is exclusive of the charges for preparation of the fee application). Paralegals are billed for 128.85 hours at an average rate of $37.00 per hour. At a quick glance, there appears to be a problem as regards the number of attorneys that worked on this case. However, ten of the attorneys billed by the firm worked less than ten hours on the case. Also, attorneys who worked on the case at its beginning and were familiar with its intricacies, have left the firm during the span of six years and new attorneys have had to spend time familiarizing themselves with the case. Furthermore, this case required not only the involvement of the firm's bankruptcy attorneys, as would normally be expected, but also, the additional services of the litigation attorneys to defend the suits filed against it by Mr. Martin-Trigona. Keeping all of these factors in mind, the Court does not find it unreasonable that 21 attorneys have worked on this case.

■ An aspect of Mr. Schneider's fee application which is non-compensable is the services he rendered prior to Court approval of his appointment. As previously mentioned, his appointment was approved on October 17, 1980. Mr. Schneider's fee application begins to run on September 18, 1980. There are 58.25 hours charged, totalling $5,933.50, by the firm for services rendered prior to its receiving Court authorization to act as trustee's counsel. Employment of trustee's counsel is governed by 11 U.S.C. § 327(a) which specifically states that Court approval is necessary. The only explanation Mr. Schneider offers for this oversight, is that he was busy "putting out the fires" alive early on in this case. Mr. Schneider must have had an application for employment in his form file, which would have taken a minimum of effort to have delivered to the court. As was stated in *In re Thibodeau*, 20 B.R. 107, 108 (Bankr.Maine, 1982):

> The court does not question that the trustee acted in good faith, but it finds neither legal nor equitable grounds for awarding attorney's fees. The trustee has offered no excuse for his failure to procure timely court authorization other than his oversight.

*Also, see, In re Johnson*, 21 B.R. 217 (Bankr.D.C.1982); *In re Bearlake West, Inc.*, 32 B.R. 272 (Bankr.D.Idaho 1983). Accordingly, the Court denies compensation for all billings prior to approval by the Court of Mr. Schneider's application for employment. This results in a deduction of $5,933.50.

■ Another aspect of Mr. Schneider's fee application the Court has difficulty with is the amount of time spent collecting receivables. As Mr. Schneider pointed out in court, he has not kept records of how much money was collected as a direct result of his efforts. The only accounting of these collections the Court has been provided with is that of the present trustee, which indicates that $3,413.75 was collected from law suits and another $1,050.00 from dunning letters. Mr. Schneider's fee application shows charges of $9,568.00 of fees for attorneys' and paralegals' work in the collection of these accounts. It must be re-

membered that Mr. Schneider's firm only completed part of the collection process, leaving it to be finished by counsel to the new trustee. The cost to the estate of at least $9,568.00 as compared to the benefit of $3,413.75 is unreasonable and any rationale for this expenditure defies common sense. Mr. Schneider explained in court: that the estate was desperate for money at the time he was chasing down these claims, it is hard to predict in advance how much will be collected, he pursued every account because of Mr. Martin-Trigona's insistence, he wanted to maintain the integrity of the collection process and, furthermore, his firm does not work on a contingency fee basis, but works strictly on an hourly rate. None of these justifications can support the disproportion between the cost to the estate as compared to the benefit received. Furthermore, a major consideration by bankruptcy courts in determining professional fees is the benefit to the estate from the results achieved *In re Continental Inv. Corp.,* 28 B.R. 972, 979 (D.C.Mass. 1982); *In re International Coins & Currency, Inc.,* 22 B.R. 127, 130 (Bankr.Vermont 1982). This Court finds that a fee of 25% of the amount collected in this case both gives the benefit of the doubt to Mr. Schneider as to whose efforts were most instrumental in the collection and comports with the collection practice as should most efficiently be pursued by the trustee. Thus, $1,100 is allowed in lieu of $9,568.00 claimed.

■ Another area of Mr. Schneider's fee application which will be disallowed is the time he has billed for attending Section 341 meetings. At the hearing on Mr. Schneider's application Mr. Martin-Trigona objected to the charge, stating that no creditors, including himself, ever attended these meetings. Mr. Schneider did not dispute this, but asserted that he felt it his responsibility, as trustee's counsel, to make an appearance at each scheduled meeting in the event creditors did attend. In the first instance, it is trustee's, not counsel's responsibility to attend these meetings. Counsel to trustee should attend these meetings only if the trustee needs legal assistance at a particular meeting. Whatever concern Mr. Schneider may have felt as regards Mr. Martin-Trigona was unwarranted, since he was in jail at the time of these meetings. Secondly, it does not make sense that after the first or second unattended meetings, Mr. Schneider persisted in appearing or sending an associate. As a precautionary measure, he could have had the trustee call him if any creditors were in attendance, and only then make an appearance. Mr. Schneider cannot charge the estate for what should have been trustee's work. All but the first charge for attending these meetings are deducted, totaling $5,793.50.

■ The first Plan of Reorganization and Disclosure Statement were filed on November 24, 1982. On January 5, 1983, a hearing was held on the Disclosure Statement and Plan of Reorganization, both of which had already been amended. Approximately 36 hours of attorneys' time was billed by the firm for work done on the Disclosure Statement up to and including the time of hearing, amounting to $3,000.00. However, the Disclosure Statement failed to account for several hundred thousand dollars of the sale price. The Court issued a sua sponte order to amend the Statement with the necessary figures. The amendments were not supplied by Mr. Schneider in proper or timely fashion. Rather, a handwritten accounting was distributed at the hearing. After this period, another 34.70 hours of attorneys' time was devoted to revising the Plan and Disclosure Statement, amounting to $5,773.50. Finally, after five revisions, the Plan was confirmed. All of these latter charges will be denied. The station had been sold and the trustee was sitting with cash to be distributed. There was nothing particularly complicated or unusual about the Plan and Disclosure Statement and there is no reason why an attorney of Mr. Schneider's capabilities could not have produced a confirmable plan on an initial submission. The delay and changes resulted because of the original failure to properly explain the difference in sale price and the reduced

amount on hand and then to properly follow up even after the Court order. This resulted not only in motions and hearings in this court but also in Connecticut courts, and even an attempt to involve the Connecticut Grand Jury. The Court has searched the fee application and found no charges for the defense of these actions.

■ Other deficiencies, such as the 262 hours in what is identified by Mr. Schneider as "Miscellaneous Administration", remain to date insufficiently explained. The explanation for this billing offered in the application is, "These time charges are those expended on tasks too small to constitute a separate category and those that could not be identified as associated with one of the separate tasks." This explanation does not wash, since several of the categories that are listed include themselves relatively few hours. When questioned about this billing at the hearing, Mr. Schneider explained that, in fact, these hours are accounted for in the coded computer print-out and can be found by cross referencing the date and attorney identified with the print-out. This places the Court in a very uncomfortable position and actually defeats the purpose of the new billing requirements set by the Court. In fact, Mr. Schneider's inability to comply with the Court's requirements as regards these 262 hours, exemplifies the very problem the Court has continually faced in attempting to render an intelligent evaluation of fee applications. How can the Court be expected to evaluate the fee application when the very attorney who rendered the services in question cannot explain the specific tasks that were rendered, or even offer a complete list of services rendered, or an approximation of time spent? Mr. Schneider in the approximate six weeks since the hearing on this matter has offered no further explanation for these 252.25 hours of billings.

The Court is left to search the computer print-out and guesstimate what portion of the lumped charges can be justifiably attributed to miscellaneous services. This process, at its best, is unsystematic and arbitrary and results in questionable results. This Court has made its views known on the necessity for accurate descriptions of services *In re WHET, Inc.*, 58 B.R. at 281, specifically instructing Mr. Schneider to make his best efforts to comply with the newly instituted requirements. The Court understands that a period of adjustment is required before attorneys can be expected to be in full compliance with its instructions and that Mr. Schneider has provided what, in the past, would have been an acceptable explanation of services. The Court will deduct two-thirds of these charges, amounting to a deduction of $19,-460.00, rather than disallow it in full. *In re Martin*, 59 B.R. 140, 145 (Bankr.D.Me. 1986).

■ During the administration of the WHET, Inc. estate, a constant area of conflict between Mr. Martin-Trigona and Mr. Schneider, was his inattentiveness to Mr. Martin-Trigona's demands for documents. This, at times, not only involved unnecessary motions and hearings, but even ignoring the Court's orders to provide documents. Finally, this problem resulted in the Court issuing sanctions against Mr. Schneider, *In re WHET, Inc.*, Slip op. 80–1542 (Bankr.Mass., May 1, 1984) in order to compel Mr. Schneider to deliver to Mr. Martin-Trigona copies of his firm's opinion letter dealing with the sale of the firm's assets. The Court has searched Mr. Schneider's fee application in order to deduct the amount of time charged by the firm in disputing Mr. Martin-Trigona's request for documents and has found, to the best of its abilities, much of this time lumped into the miscellaneous category. There is one category entitled "AMT Motion for Recusal and Demand for Production of Documents." However, the short period of time noted in this category does not coincide with what the Court knows to be the dates over which this dispute extended. Unable to find a breakdown of charges for the time spent in this area, the Court is left to its best estimate. The remaining one-third, $9,730.00, of the fee requested in the category of "miscellaneous" is deducted as the cost resulting from

Mr. Schneider's uncooperative and unresponsive attitude toward the Court's explicit instructions to make documents available to Mr. Martin-Trigona. The Court makes this blanket deduction because it is the inappropriate lumping in Mr. Schneider's application which makes it impossible to make a more accurate adjustment. *In re Martin*, 59 B.R. at 145.

■■ Mr. Schneider has submitted a pleading entitled "Services in Connection with Fee Application Process" which includes billings for 60.20 hours of attorneys' work for a fee of $10,478.00. There are two attorneys who are billed for these services: Mr. Schneider at $175.00 per hour, and Mr. Gestel at $185.00. It is hard to imagine a fee application that would warrant such high price legal services. However, this application does not justify the cost of its completion. A fee application should be self-explanatory and not require the Court to spend an extraordinary amount of time in an effort to understand the services rendered by counsel. Unfortunately, Mr. Schneider's fee application does not meet this standard. To begin with, there is a double billing for both Mr. Schneider and Mr. Gestel attending the same hearing. The Court will deduct $1,101.50 off the top of this application, the total charges for Mr. Gestel's attendance at the hearing. There are basic gaps in Mr. Schneider's application, such as the 262 hours of miscellaneous billings and the necessity for cross-referencing between different time sheets. Another flaw caused in Mr. Schneider's preparation are the pages in the application that are so poorly copied they are nearly impossible to read.

■■ The Court has previously stated that it understands that there will be a period of adjustment during which counsel will adopt the new application process, *In re WHET, Inc.*, 58 B.R. at 281. With this in mind, the Court has been lenient in its consideration of Mr. Schneider's fee application. However, Mr. Schneider cannot expect both this leniency and extraordinary compensation for an inadequate job. Generally, this Court's policy on remuneration for services rendered in preparation of a fee application is that the time should only be partially compensated. Thus, limiting the fee to the increased cost in abiding by the Court's requirements over what a non-bankruptcy client being billed a fee of this size could expect as explanatory detail. *In re WHET, Inc.*, 61 B.R. 709, 712–13 (Bankr. Mass., 1986). Further, if contemporaneous time records are kept, the preparation of a fee application should be a rather mechanical task. Keeping all of this in mind, Mr. Schneider will be allowed $4,500.00 for services rendered in preparation of his application.

■■ The balance of the fee request reflects reasonable charges for necessary services, and is allowed. It should be noted that the Court has conducted its own analysis of the fee application as well as investigating all of the complaints voiced by Mr. Martin-Trigona. Other than the specifics addressed above, the Court finds the remainder of the charges reasonable. A question was raised at the fee hearing of a duplication of efforts between attorneys. On review, the Court finds whatever duplication charged to be within reason. An area complained of by Mr. Martin-Trigona, were charges for the handling of the SLJ and Affiliated matter. Although the Court recognizes that much of the work in this area had to be repeated because of the trustee's failure to timely produce all of the relevant bookkeeping records, the ineptness of the trustee in this situation cannot be attributed to his counsel. It should be noted that the original trustee in this matter has waived any fee request he may have. In total, the charges deducted from the fee requested amount by Mr. Schneider, total $61,136.50.

■■ We now turn to the subject of disbursements, detailed in the fee application and the addendum entitled "Services in Connection with Fee Application Process." This Court has a policy of restricting infirm duplication charges to six cents per page, *In re WHET, Inc.*, 61 B.R. 709, 712–13 (Bankr.Mass., April 8, 1986). There are charges amounting to $7,664.52 which were

charged at a range of between 10 and 15 cents per page. This will be reduced to a charge of six cents per page, resulting in a charge of $3,963.00. There is a billing for secretarial overtime, costing $581.78. This Court does not allow secretarial overtime without explicit evidence of some specific emergency situation or other demands placed on the secretary during the day which required the overtime. Here, there was no such showing. There is a charge entitled "Miscellaneous" for $744.76. This charge is disallowed in full, due to the lack of detail. Mr. Schneider could not explain these charges in court, and the Court is hard pressed to find an explanation when every other possible disbursement has been detailed on the bill. The deductions total $5,028.06.

A matter separate and apart from the fee application, but which is appropriately dealt with at this time is the question of a Wall Street Journal bill for advertising in the amount of $3,627.36. The gist of the facts behind this billing is that Mr. Ferrari and Mr. Schneider were considering placing an advertisement concerning the station in the Northeastern edition of the Wall Street Journal. Mr. Schneider's secretary called the journal for an estimate of the cost of such an advertisement. A fact of questionable propriety in and of itself, since a matter such as advertising the assets of the estate is clearly trustee's work. No advertisement was ordered; however, the Journal went ahead and placed the advertisement in its National edition for reasons that, to date, remain unexplained. A bill was sent to the estate for this ad in care of Goodwin Procter & Hoar for $3,627.36. Letters were sent by both Mr. Schneider and Mr. Ferrari, protesting the charges, to apparently no avail. Testimony was given by Mr. Ferrari at the hearing on Mr. Schneider's first interim fee application, on August 3, 1983, indicating that he was instructed against his own judgment by Mr. Schneider to pay the total bill. The reasons given by Mr. Ferrari for this insistence by Mr. Schneider were two-fold. One, the estate had benefitted from the ad, although an ad in the Northeastern edition would have been preferable. Second, the Journal was threatening suit against Goodwin Procter & Hoar. The Court does not approve of Mr. Schneider instructing the trustee to make a payment from the estate's funds for services that were neither authorized nor, to the extent that the advertisement was placed in the National edition, warranted. Furthermore, the placing of such an advertisement is clearly trustee's work, and Mr. Schneider's office should have had minimum involvement and, at any rate, should not have overruled the trustee's reluctance to pay this bill without obtaining Court approval. Generally, the Court would deduct the full cost of this bill from Mr. Schneider's fee application. However, because the bankruptcy Court is a court of equity and the advertisement was intended to be placed in one of the three Journal editions, only two-thirds of the bill, $2,418.32, will be deducted.

In accordance with the above, $7,446.31 is deducted from the disbursements, and $6,186.03 is allowed.

In summation, Mr. Schneider has requested a fee of $221,683.90. Of this amount, $75,000 was paid to him in August of 1983 pursuant to a Court order, leaving a balance of $146,683.90. The Court has deducted $61,136.00 from the requested fee, resulting in a balance of $85,547.90. The Court has allowed $6,186.03 of the requested $13,662.34 for disbursements. The total of the allowed charges for fee and disbursements equal $91,733.93, which will be increased by ten (10) percent as compensation for the time delay due the firm, for an award of $100,907.26.